IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI

UNITED STATES OF AMERICA,

Plaintiff,

V.                                              CRIMINAL CASE NO. 4:17-CR-131-DMB-JMV

SCOTT E. NELSON,

Defendant.

**MEMORANDUM IN SUPPORT OF MOTION FOR JUDGMENT OF ACQUITTAL
AND/OR NEW TRIAL**

Comes now, Defendant Dr. Scott Nelson, by and through counsel, and submits his

Memorandum in Support of Motion for Judgment of Acquittal or, Alternatively, New Trial.

**Legal Standards**

**I.        Motion for Judgment of Acquittal**

"A motion for judgment of acquittal challenges the sufficiency of the evidence to

convict." *United States v. Lucio*, 428 F.3d 519, 522 (5th Cir. 2005) (quoting *United States v.*

*Medina*, 161 F.3d 867, 872 (5th Cir. 1998)). When a defendant challenges the sufficiency of the

evidence, "the relevant question is whether, after viewing the evidence in the light most

favorable to the prosecution, any rational trier of fact could have found the essential elements of

the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also*

*United States v. Lopez–Urbina*, 434 F.3d 750, 757 (5th Cir. 2005) (applying *Jackson*).

A reviewing court only credits "reasonable inferences from the evidence." *United States*

*v. McDowell*, 498 F.3d 308, 312 (5th Cir. 2007). It does not credit inferences simply because

they are "within the realm of possibility when those inferences are unreasonable." *United States*

*v. Moreland*, 665 F.3d 137, 149 (5th Cir. 2011). "[A] verdict [also] may not rest on mere

1

suspicion, speculation, or conjecture, or on an overly attenuated piling of inference on inference." *United States v. Rojas Alvarez*, 451 F.3d 320, 333 (5th Cir. 2006). "If there is a lack of substantial evidence, viewed in the government's favor, from which a reasonable factfinder could find guilt beyond a reasonable doubt, the conviction must be reversed." *United States v. Willner*, 795 F.3d 1297, 1307 (11th Cir. 2015).

## II.     Motion for New Trial

Federal Rule of Criminal Procedure 33 allows a trial court to "vacate any judgment and grant a new trial if the interest of justice so requires." FED. R. CRIM. P. 33(a). Rule 33 recognizes that if a trial court concludes for any reason that the trial has resulted in a miscarriage of justice, the court has broad powers to grant a new trial. *United States v. Scroggins*, 379 F.3d 233 (5th Cir. 2004), vacated on other grounds, 543 U.S. 1112 (2005). In determining whether the substantial rights of the defendant were affected, courts may aggregate all alleged errors, under the cumulative effect doctrine, to determine if together any harmless errors are no longer harmless, requiring a new trial. *United States v. Barrett*, 496 F.3d 1079, 1121 (10th Cir. 2007).

## Law and Argument

### I.     The Court should grand judgments of acquittal because the verdict was irrational, inconsistent, and contrary to the evidence.

The Court should grant judgments of acquittal under Federal Rule of Criminal Procedure 29 because the jury's verdicts were contrary to the evidence, inconsistent, and irrational.

### A.  There is no evidence that Nelson committed healthcare fraud as to any of the substantive counts set forth in the indictment.

#### a.  As to all substantive counts, there is no evidence that Dr. Nelson was the certifying physician.

There is no question that in order for the hospices to be reimbursed by Medicare, the

hospices must submit a certification of hospice eligibility. 42 U.S.C. § 1395f. The Medicare

Hospice Benefit allows two 90-day benefit periods for eligible patients, followed by an unlimited

number of 60-day benefits periods. 42 U.S.C. § 1395d(a)(4). At the end of each benefits period,

the patient can be recertified for hospice if the patient still meets the requirements for eligibility.

42 U.S.C. § 1395f(a)(7). During the first 90 days, a hospice provider must obtain a written

certification that the patient is "terminally ill" from (1) the hospice medical director or a

physician in the hospice interdisciplinary group, and (2) the individual's attending physician, if

any. 42 C.F.R. § 418.22. For subsequent periods, certification of terminal illness may be from

either the hospice medical director or a physician in the hospice interdisciplinary group. *Id*. The

hospice provider is to obtain the written certification "at the beginning of the period," and "must

obtain the written certification before it submits a claim for payment." *Id*.

A patient is terminally ill when "the individual has a medical prognosis that his or her life

expectancy is 6 months or less if the illness runs its normal course." 42 C.F.R. § 418.3. The

attending physician and medical director must certify that the patient is terminally ill based on

their clinical judgment of normal course of the patient's illness. 42 U.S.C. § 1395f(a)(7).

"Clinical information and other documentation that support the medical prognosis must

accompany the certification and must be filed in the medical record .... Initially, the clinical

information may be provided verbally, and must be documented in the medical record and

included as part of the hospice's eligibility assessment." 42 C.F.R. § 418.22. The certification

must include a narrative description of the patient, and the certifying physician must "confirm[ ]

that he/she composed the narrative based on his/her review of the patient's medical record or, if

applicable, his/her examination of the patient."[1] 42 C.F.R. § 418.22(b)(3)(iii).

Despite the unrebutted testimony from handwriting expert Grant Sperry concerning the potential forgery of each signature in each patient chart, as a preliminary matter, to reach its verdict as to each count, the jury would have first had to assume that the purported signatures were Dr. Nelson's. Even assuming that the signatures were Dr. Nelson's, the jury's verdicts were based on the incorrect assumption that Dr. Nelson was the certifying physician, despite evidence to the contrary. When testifying, Agent Loggins explained that a written narrative in the certification of terminal illness must be composed by the certifying physician and conform to a certain format before it can be submitted for billing. When reviewing each patient chart, Loggins acknowledged that Dr. James Warrington —who the Government *did not* call as a witness— was the certifying physician under each narrative; however, he later misrepresented to the jury that both Dr. Warrington and Dr. Nelson were the certifying physicians. The medical records for Anderson, Tillman, Shields, Bellman, and Brown reflect Loggins's testimony that Dr. Warrington wrote the written narrative and signed each certification as the certifying physician. The records also reflected that Dr. Warrington signed the recertifications as the certifying physician, with Dr. Nelson's signature noticeably absent from Tillman's recertification form as the attending physician. For patients Mitchell and Davis, their records reflect that Dr. Karim — who the Government *did not* call as a witness— wrote the written narratives and signed as the certifying physician for the initial and subsequent benefit periods, with Dr. Nelson's signature affixed as the attending physician. For the jury to reach its verdict as to each substantive count, it would have had to assume that 1) the signatures were actually Dr. Nelson's despite Sperry's

---

[1] In addition to his opinion concerning Dr. Nelson's purported signature, Grant Sperry testified that there was no narrative handwriting style from Dr. Nelson on *any* certification of terminal illness nor any other document in the hospices' records.

unrebutted testimony concerning the various likelihood of forgeries as to each patient; 2) Dr. Nelson was the certifying physician for each patient, even though the Government failed to call Dr. Warrington and Dr. Karim to explain why they signed the certifications as the certifying physicians; and 3) Dr. Nelson, Dr. Warrington, and Dr. Karim all incorrectly signed the certifications, even though there was no testimony to supplement the contents of the medical records and explain each doctor's role in the certification or recertification process.

Aside from the medical records, the only other evidence presented by the Government to show that Dr. Nelson was the certifying physician were the hospices' submissions of Dr. Nelson's NPI number when billing for hospice services. While records established that the hospices would submit Dr. Nelson's NPI number when billing for services, there was no testimony from any witness that established or inferred that Dr. Nelson knew that his NPI number was being submitted or that he acquiesced to its submission. Rather, billings records established hospices practice of submitting Dr. Nelson's NPI number even when patient medical records cleared showed Dr. Nelson's signature as wholly absent from a certification, as seen with Anderson's medical records and the associating billing record. In other words, the jury would have also had to assume that Dr. Nelson knew the hospices were submitting his NPI number as the certifying physician, even though there was no evidence establishing that he was aware of the hospices' billing policies and practices and even though there was at least one medical record clearly showing his absence from the certification process.

     **b.  As to the substantive counts, there is no evidence that Dr. Nelson certified patients as being terminally ill knowing that each patient was not terminally ill.**

As to each patient named in the substantive counts, even assuming that Dr. Nelson was the certifying physician, there is no evidence that he certified each patient knowing that the

patient was not terminally ill. 18 U.S.C. § 1347(a); *Jackson*, 220 Fed. Appx. at 323-24 (finding evidence insufficient where prosecution failed to present evidence of knowledge); *United States v. Medina*, 485 F.3d 1291, 1297-89 (11th Cir. 2007) (same finding).

Here, the Government presented two theories to convince the jury that Dr. Nelson was falsely certifying patients as terminally ill. Under the main theory, a nurse or nurse practitioner would conduct an initial health and physical exam, then present their findings and a certification form to Dr. Nelson, who would then robo-sign and certify the patients as terminally ill without ever seeing them, even though the Medicare regulations allow Dr. Nelson to rely on a nurse's medical documentation for certification. Under the second theory, Dr. Nelson would see the patient, properly diagnose the patient and certify them as terminally ill, but the patient would live past the initial prognosis.

### i. Count II - Mazie Anderson

The testimony and documentary evidence established that Ms. Anderson was on hospice for two benefit periods. Ms. Anderson's medical records showed that a hospice employee and nurse Gwen Williams conducted the initial health and physical examination. Ms. Anderson recalled seeing several nurses, including nurse Williams. Ms. Anderson also testified that her primary care physician was Dr. Booker, who informed her that she had been unknowingly put on hospice. Although the Government investigator wrongly asserted that there are two certifying physicians on a certification of terminal illness, Ms. Anderson's medical records established that after nurse Williams conducted the initial health and physical examination, Dr. James Warrington drafted the narrative for the certification and signed as the certifying doctor, while Dr. Nelson's signed as the treating or attending physician. During Ms. Anderson's second benefits period, only Dr. Warrington signed as the certifying physician. The Government called

neither Dr. Warrington nor Ms. Williams.

### ii. Count III - Earnestine Tillman

Ms. Tillman recalled visiting Dr. Nelson one time, although she testified that she could not recall much detail about the visit. Her medical records showed that Dr. Nelson wrote an order referring her to hospice and nurse Williams conducted the initial health and physical evaluation. Her medical records also showed that she was on hospice for three benefit periods. During all three benefit periods, Dr. James Warrington was the certifying physician. While Dr. Nelson's purported signature was on the first certification of terminal illness as the treating physician, Sperry indisputably testified that the purported signature was likely a forgery. As to the second and third certifications, Dr. Nelson's signature was absent. Even though Ms. Tillman testified that did not feel as though she was dying, her medical records showed that she had a brain tumor and history of strokes.

### iii. Count IV - Eddie Mitchell

Patient Eddie Mitchell also testified during the Government's case-in-chief. Mr. Mitchell testified that Dr. Karim was the original certifying physician, and his medical records showed that he visited Dr. Nelson two months *after* Dr. Karim certified him for hospice and he was already under the care of Haven Hospice. His medical records also showed that Dr. Nelson had no knowledge of his enrollment in hospice and Dr. Nelson did not initially agree to admit him into hospice until additional review of his medical records. As with every other patient named in the indictment, nurse Gwen Williams conducted the initial health and physical examination. Dr. Nelson later referred Mr. Mitchell to hospice without knowing that Mr. Mitchell's own attending physician, Dr. Karim, had already certified him as terminally ill and enrolled him into Haven Hospice. The Government called neither nurse Williams nor Dr. Karim, and there was also no

testimony proving that Dr. Nelson falsely certified Mr. Mitchell — which would have also meant that he *and* Dr. Karim improperly certified Mr. Mitchell.

### iv. Count V - Linda Shields

Linda Shields testified that she had received disability benefits for the past thirteen years. Her medical records supported her testimony of having a history of heart failure and diabetes. She testified that she never met Dr. Nelson. While she does remember visiting nurses, she recalls the nursing advising her that they were from home health. She received hospice care for two benefits periods. As with the other patients, the CTIs reflected that Dr. James Warrington was the certifying physician, signing right after the narrative. Unlike most of the other patients, Dr. Nelson's signature was affixed as the attending physician, and Sperry testified that the signature was more than likely Dr. Nelson's signature. Hospice owner and nurse Charline Brandon conducted the initial health and physical evaluation.

Ms. Shields's primary care physician, Dr. Jacqueline Hampton, testified that she saw Ms. Shields after Ms. Shields was placed on hospice. Dr. Hampton further testified as to Ms. Shields's medical history and acknowledged that there was a clear difference between diagnosis and prognosis and that it was difficult to accurately determine the life expectancy of a hospice patient. Again, the Government failed to call Dr. Warrington, and Ms. Brandon died prior to trial.

### v. Count VII - Eva Bellman

Eva Bellman testified that she first saw Dr. Nelson after she was taken off of hospice. While in hospice, though, Dr. Warrington certified her as terminally ill for two benefit periods, with Dr. Nelson's signature affixed as the attending physician. Ms. Bellman's medical records showed that nurse Janice McNeal conducted the initial health and physical evaluation; however,

8

neither Dr. Warrington nor nurse McNeal testified.

### vi. Count VIII - Terome Davis

Like the other substantive counts, no rational jury could have found that Dr. Nelson falsely certified Mr. Davis knowing that he was not terminally ill. The Government never called Mr. Davis to testify about his health or need for hospice. Rather, the Government relied on testimony from Mr. Davis's longtime caretaker, Catherine Davis. Although not a medical expert, Ms. Davis testified that she believed that Mr. Davis's health was stable and he was not dying — though he obviously required the need of a caretaker. Fitting the pattern of all of the substantive count patients, nurse Gwen Williams conducted the health and physical evaluation.

Even though Mr. Davis was eventually seen by Dr. Nelson, he was put on hospice approximately six months prior to seeing Dr. Nelson by Dr. Karim. Mr. Davis's medical records reflect that Dr. Karim was the certifying physician for the initial and second benefits periods. On both CTIs, Dr. Nelson signature was placed as the attending physician; however, Sperry testified that Nelson's signature was likely forged on the initial CTI, and that it was indeterminant for the second benefits period. Once again, the Government failed to call Dr. Karim or nurse Williams to discuss their role in Mr. Davis's certification.

### vii. Count X - Jimmy Brown

Jimmy Brown testified that he had been a bricklayer since 2013 and was still laying bricks as of the date of trial. He testified that he never saw Dr. Nelson nor knew that he was ever placed on hospice. His medical records follow the typical pattern of a nurse conducting the initial health and physical examination, with nurse Kina Richard conducting his examination. His medical records also reflect him being placed on hospice for two benefit periods. On both CTIs, Dr. Warrington wrote the narratives and signed as the certifying physician, while Dr. Nelson's

signatures were affixed as the attending physician. As to Mr. Brown, the Government did not call Dr. Warrington nor nurse Richard to discuss the health and physical examination or their role in the certification process.

In addition to patients, the Government called Misty Day to explain Medicare regulations. Ms. Day testified that a physician can accept the evaluation of a nurse practitioner, and that a certifying physician can acknowledge the nurse's evaluation of a patient as being terminally ill and complete a CTI based on that evaluation without ever seeing the patient.

As to each substantive count, while Agent Loggins alleged that Dr. Nelson falsely certified each patient as terminally ill, he never testified that Dr. Warrington also falsely certified each patient or did so under false pretenses as to any patient associated with Dr. Warrington, nor did Loggins testify as to anything similar concerning those patients also co-"certified" by Dr. Karim. Loggins's testimony centered almost entirely around Dr. Nelson robo-signing CTIs and records supplied to him by hospice employees — a practice that witness Wendy Gore said was standard in the industry, since doctors must trust their staff and colleagues to provide accurate and truthful documents. Despite proving lax practices, Loggins offered no testimony even implying that Dr. Nelson *knew* that the patients were ineligible for hospice.

Instead, Loggins stretched his testimony to imply that because of Dr. Nelson's affiliation with multiple hospices, he must be guilty by association. Loggins testified that Dr. Nelson was one of many medical directors that he investigated and was the doctor with the second-highest discharge rate based on hospice' submission of his NPI number. Loggins also testified that he and Delgado met with Dr. Nelson for several hours in September 2014, describing Dr. Nelson as cooperative and willing to review records. Loggins explained that during the September 2014 meeting, Dr. Nelson admitted to robo-signing multiple CTIs and other documents brought to him

by the hospices and did so because he trusted hospice staff to bring him accurate and truthful information concerning patients. Loggins opined that even though Dr. Warrington signed as the certifying physician, Dr. Nelson may have somehow flipped the signature on the CTIs. He further testified that after the September 2014 meeting, Dr. Nelson met with the hospices and implemented a policy of no longer robo-signing documents brought to him by hospice employees. Interestingly, after the September 2014 meeting, Loggins saw no other indication of robo-signing.

      Loggins admitted that he was not an expert in Medicare regulations and his investigation hinged on data that he collected from other third parties. He further testified that he did not confirm the accuracy of the data and (similarly to how Dr. Nelson relied on his hospice staff to supply accurate and truthful information) simply assumed that the data he received was accurate. He admitted that even though he received over six hundred patients charts through a subpoena duces tecum, he did not review all of the charts. He further admitted that unlike other healthcare fraud investigation, such as that against Dr. Nate Brown, there was no indication that Dr. Nelson received kickbacks. He continuously emphasized that Dr. Nelson's role in the alleged misconduct was based primarily on him robo-signing forms submitted by the hospices.

      Ultimately, Loggins's and Delgado's testimony centered around either robo-signing or a difference of opinion as to Dr. Nelson's diagnosis and prognosis of each patient named in the indictment. Neither Loggins nor Delgado testified that Dr. Nelson knew of the practices, policies, and internal workings of each hospice nor had knowledge of any wrongdoing on the part of the hospices or their employees, let alone that he either expressly or implicitly acquiesced to any agreement to commit healthcare fraud. Rather, Delgado's and Loggins's testimony established only that 1) their investigation relied on data submitted by third parties; 2) that data

was based on information submitted by the hospices; 3) the hospices submitted Dr. Nelson's NPI

number; and 4) Dr. Nelson would robo-sign documents without knowing about the hospices'

activities.

To secure a conviction, the Government relied on inference upon inference, such that no

reasonable juror could have returned a guilty verdict as to any substantive count. Aside from

concerning hospice and not home health, this case is remarkably similar to *United States v.

Ganji*, 880 F.3d 760 (5th Cir. 2018), to the point where one need only replace Nelson for Ganji

and hospice for home health or home aid.

> We acknowledge that the Government presented evidence of Dr. [Nelson]'s
> participation in lax practices. However, Dr. [Nelson] was not convicted of patient
> negligence, keeping subpar files, or haphazardly conducting [his] business. [He]
> was convicted of defrauding the Government by certifying [patients] for [hospice]
> care, knowing that [they were] not [hospice eligible]. Beyond proving that
> [patients] did not need [hospice], the Government was to prove, beyond a
> reasonable doubt, that Dr. [Nelson] was aware of that reality. Unlike other health
> care fraud cases presented to this Court, the Government did not provide testimonial
> or documentary evidence proving that Dr. [Nelson] knew [patients were] not
> [hospice eligible]. It presented evidence of [patients'] primary care physician's
> knowledge but it failed to present any evidence imputing that knowledge to Dr.
> [Nelson]. The evidence allowed the jury to infer that [patients were] were not
> [hospice eligible], but it cannot stretch that into a second inference that Dr. [Nelson]
> knew [they were] not [hospice eligible].

*Id*. at 777-78.

Here, even assuming that the Dr. Nelson was the certifying physician for each patient, the

Government presented no evidence —whether testimony or documentary— that he was made

aware that any of the patients were not hospice eligible or that he learned of their ineligibility

before the certification. Rather, Dr. Nelson learned that the patients were ineligible for hospice at

the same time as the jury: at trial. Based on the Government's argument and majority theory of

the case, Dr. Nelson robo-signed documents without knowing the documents' contents.

Testimony from the trial established that while not best practices, Dr. Nelson could sign as the

certifying physician based on documentation and information supplied to him by a nurse — a practice reflected by the regulations and therefore legal. This is not fraud, and Dr. Nelson "cannot be held liable for fraudulence as a result of activity that is legal." *Ganji*, at 778.

As to the patients that Dr. Nelson saw, the evidence proved that they were either already placed on hospice by other doctors prior to Dr. Nelson certifying or that there was a difference of opinion as to prognosis. For the jury to reach its verdicts, it would have to infer that each patient was not eligible (even though medical records presented to Dr. Nelson established that they were and even though other doctors certified certain patients prior to Dr. Nelson's certification), the nurses and other doctors who participated in the certification process knew that the patients were ineligible for hospice (even though no other doctor or nurse identified in the certification process testified), Dr. Nelson was the certifying physician and the other doctors signed the wrong part of the certifications(even though no other doctor who signed the certification testified or explained their role in the certification), and that Dr. Nelson knew that the patients were ineligible before certification (even though medical records presented to Dr. Nelson for certification reflected a terminal illness and even though there was no testimony or other evidence proving that Dr. Nelson knew about their ineligibility before certification).

A conviction cannot stand where it is based on "inference upon inference." *United States v. Menesses*, 962 F. 2d 420, 426 (5th Cir. 1992). Rather, the Government must provide evidence that the accused doctor executed a fraudulent scheme with knowledge that the patient was ineligible for Medicare services. *See* 18 U.S.C. § 1347(a); *United States v. Jackson*, 220 Fed.Appx. 317, 323-24 (5th Cir. 2007). Here, there is no evidence —direct or circumstantial— supporting a guilty verdict on any count.

**B.  The jury's split verdict is internally inconsistent and cannot be reconciled.**

Dr. Nelson's convictions cannot be reconciled with the counts in which he was acquitted. At the trial, the jury heard from Marjorie Brown. Ms. Brown testified that she never felt terminally ill, but that she was placed on hospice sometime after nurses came to her home and evaluated her. Her medical records revealed that she was placed on hospice for two benefit periods and that Dr. James Warrington certified her as terminally ill for both periods, with Dr. Nelson's signature affixed as the attending physician. Ms. Brown recalled that once she saw Dr. Nelson, he took her off of hospice and hospice employees stopped coming to her home soon afterwards. Handwriting expert Sperry testified that Dr. Nelson's signatures were likely forged. The jury acquitted Dr. Nelson of this count.

The jury also acquitted Dr. Nelson as to the substantive count concerning Eddie Clark. Mr. Clark testified that he never saw Dr. Nelson, and that Dr. Hampton was his primary care physician. He also testified that he recalled seeing a nurse, Pearline Bailey, periodically. His medical records followed the all-too-familiar pattern of nurse Gwen Williams conducting the health and physical examination, with Dr. Warrington's signature placed immediately after the written narrative for two benefits period, followed by Dr. Nelson's purported signature as the attending physician. Sperry testified that there were likely forgeries of Dr. Nelson's signature within the chart. The jury acquitted Dr. Nelson of this count, as well.

As discussed above, the majority of the substantive counts follow the same pattern, where the patient was first seen by a nurse, the nurse conducted an initial health and physical examination, presented the documents and a certification to Dr. Nelson, and Dr. Nelson signed as the attending physician, while another doctor (usually Dr. Warrington) signed immediately after the written narrative. At trial, there was no dispute that it was appropriate for Dr. Nelson to rely on medical records and nurses' notes to certify a patient as terminally ill without ever seeing the

patient. Despite the identical patterns of certifications among the various patients, Dr. Nelson was acquitted of falsely certifying Ms. Brown and Mr. Clark and found guilty of the remaining patients. The jury's guilty verdicts are inconsistent, against the weight of the evidence, and should be set aside.

**C. There is no evidence from which a reasonable juror could have inferred an agreement between Nelson and any co-defendant to enter a conspiracy.**

The Government's failure to introduce any evidence that Dr. Nelson entered into a conspiracy with Wendell Brandon, Charline Brandon, Annettte Lofton, Roesha Sanders, Sandra Livingston, Lara Lynn Thompson, Andre Kirkland, or anyone else to defraud Medicare fails to support Dr. Nelson's conviction in Count I. 18 U.S.C. § 1347(a)(1) makes it a crime to "knowingly and willfully … defraud any healthcare benefit program." To prove a conspiracy to commit health-care fraud in violation of 18 U.S.C. § 1349, "the government must prove beyond a reasonable doubt that (1) two or more persons made an agreement to commit health-care fraud; (2) that the defendant knew the unlawful purpose of the agreement; and (3) that the defendant joined in the agreement willfully," that is, with the intent to further the unlawful purpose. *United States v. Willett*, 751 F.3d 335, 339 (5th Cir. 2014) (quoting *United States v. Grant*, 683 F.3d 639, 643 (5th Cir. 2012)).

Generally, in the criminal context, a willful act is one undertaken with bad purpose, which requires the Government to prove that the defendant acted with knowledge that his conduct was unlawful. *Bryan v. United States*, 524 U.S. 184, 191-92 (1988) (citing *Ratzlaf v. United States*, 510 U.S. 135, 137 (1994). The Fifth Circuit recognizes that while willfully can vary depending on the context, willfully for purposes of § 1347 still requires "specific intent to defraud." *United States v. Willett*, 751 F.3d 335, 339 (5th Cir. 2014). While conspiracy to commit healthcare fraud is separate crime from healthcare fraud, conspiracy does not lessen the

mens rea requirement. *See United States v. Brooks*, 681 F.3d 678, 699 (5th Cir. 2012); *see also Willett*, 751 F.3d at 339.

Taking the evidence and testimony as true, the Government failed to present evidence crucial for the key element of a conspiracy allegation: an agreement between co-conspirators. *See United States v. Holcomb*, 797 F.2d 1320, 1327 (5th Cir. 1986) (acknowledging that an agreement between two or more people is an essential element of conspiracy). An agreement between the defendant and another individual is "the essence of the conspiracy offense. … It is, in another words, the sine qua non of the crime itself." *United States v. Tyson*, 653 F.3d 192, 206 (3d Cir. 2011) (internal quotation and citations omitted). Without evidence of an agreement, there can be no conspiracy, even if each of the alleged co-conspirators individually acted to defraud Medicare. *See Jackson v. Virginia*, 443 U.S. 307 (1979) (holding that a conviction must be based on evidence sufficient "to convince a trier of fact beyond a reasonable doubt of the existence of every element of the offense").

While evidence of an agreement can be circumstantial, "the prosecution must still offer some evidence showing that the conspirators knew 'the essential of the conspiracy.'" *United States v. Ballard*, 663 F.2d 534, 543 (5th Cir. 1981) (internal citation omitted). "[M]ere association" is not sufficient to establish participation in a conspiracy. *Fitzharris*, 633 F.2d at 423. *See also United States v. Robertson*, 110 F.3d 1113, 1119 (5th Cir. 1997); *United States v. Gomez*, 776 F.2d 542, 549 (5th Cir. 1985) (evidence insufficient where defendant convicted "merely on a showing that he associated with individuals participating in a conspiracy"); *Jackson*, 700 F.2d at 185 (evidence insufficient where it showed, at most, that defendant associated with others who were involved with a conspiracy). Similarly, "[m]ere similarity of conduct among various persons and the fact that they have associated with or are related to each

other do not establish the existence of a conspiracy." *United States v. White*, 569 F.2d 263, 268 (5th Cir. 1978). *See also United States v. Parker*, 839 F.2d 1473, 1478 (11th Cir. 1988) ("The appellants certainly directed their efforts toward the common goal of making money for themselves and their employer. . . . While the evidence clearly shows that the law was violated, there is insufficient evidence of a common agreement. Without evidence showing or tending to show a meeting of the minds to commit an unlawful act, the convictions cannot stand.").

In this case, as discussed above, the Government failed to prove that Dr. Nelson fraudulently certified any specific patient as hospice eligible. Rather, the Government's case hinged on medical records supplied by hospice employees to secure Dr. Nelson's certification or Dr. Nelson's meeting with hospice patients, both of which allowed Dr. Nelson to exercise his clinical judgment to find patients hospice eligible. The jury was not convinced that Dr. Nelson conspired to commit healthcare fraud as to Annette Lofton's hospice, Zion, as reflected in the jury's acquittal of the two Zion patients. As to the patients that the jury returned guilty verdicts for, their medical records established that Dr. Nelson was one of three doctors (he, Dr. Karim, and Dr. Warrington) who signed patients' CTIs; however, Dr. Nelson was the only doctor prosecuted and the Government failed to call Drs. Karim and Warrington to testify as to their role in the certification process nor was their any testimony to indicate that Dr. Karim nor Dr. Warrington falsely certified patients as terminally ill.

While the Government established that Dr. Nelson was a medical director for fourteen hospices, the Government offered no proof that Dr. Nelson either knew of the hospices' practices and schemes to act unlawfully. Instead, the Government presented a patchwork of testimony from co-conspirators, hospice employees, and one of Dr. Nelson's former employees to try and establish a conspiracy; however, despite the Government's best efforts, no one established Dr.

Nelson as a participant in any conspiracy — nor as a principal in the substantive counts.

Of the indicted or named co-conspirators, neither Charline Brandon, Andre Kirkland, Wendell Brandon, nor Roesha Sanders testified. As to Charline Brandon and Andre Kirkland, based on Loggins's testimony, they died sometime before trial, while the Government simply did not call Wendell Brandon nor Roesha Sanders. Called by the Government, indicted co-conspirator and Zion Hospice owner Annette Lofton denied forging Dr. Nelson's signature. She testified that she paid Dr. Nelson for her own personal doctor visits. When discussing the CTIs, Ms. Lofton admitted that almost all of the CTI forms containing Dr. Nelson's purported signature were insufficient to bill for hospice services and only a properly completed form could be used to bill for hospice services. When testifying, Ms. Lofton neither stated nor implied that Dr. Nelson knew that any Zion Hospice patient seen by Dr. Nelson were ineligible for hospice, knew that she was submitting false claims for hospice services, or agreed to engage in any fraudulent activity.

Laura Thompson also testified for the Government. She testified that she was indicted alongside Sandra Livingston for healthcare fraud concerning Sandanna Hospice, Inc. and Milestone Hospice, Inc. She told the jury that Milestone used Dr. Nelson and Dr. Nate Brown as medical directors and she took patients to see Dr. Nelson. While she denied forging signatures, she testified that she saw evidence of copy and paste forgeries while working at Milestone, and participated in charting parties, where Milestone employees would falsify patient records and various documents. She also testified to working with a third hospice, Delta Soul, and knew that Delta Soul employees regularly altered and falsified patient records. When discussing Dr. Nelson, like Ms. Lofton, Ms. Thompson did not state nor imply that Dr. Nelson knew that patients were not terminally ill and ineligible for hospice or that he knew of or participated in the

18

hospices' fraudulent practices. Rather, she testified that Dr. Nelson tended to take time meeting with patients and ordering tests.

The Government also called Lanetta Douglas. Ms. Douglas testified that she worked with Ms. Lofton and Zion Hospice for approximately four years. As part of her duties, she would regularly transport patients to Dr. Blackwell's and Dr. Nelson's offices. She recalled taking checks to Dr. Nelson's office on Ms. Lofton's behalf and getting receipts for each check. Like Ms. Thompson, Lanetta Douglas recalled several times that Dr. Nelson would sit with patients and explain terminal illnesses and hospice care to patients. She further testified that Dr. Nelson did not approve every patient for hospice that she brought to him for evaluation. As with the Government's other witnesses, Ms. Douglas did not state nor imply that Dr. Nelson knew of any wrongdoing by any hospice or hospice employee.

Brenda Douglas also testified during the Government's case-in-chief. As with Lanetta Douglas, Brenda Douglas testified that she took patients to see Dr. Nelson, sometimes two or three at a time, and that Dr. Nelson did not admit all patients to hospice. Like every other Government witness, Ms. Douglas did not state nor imply that Dr. Nelson knew of any wrongdoing by any hospice or hospice employee.

The Government also called Sandanna and Milestone owner (and alleged co-conspirator) Sandra Livingston. Ms. Livingston, who only pleaded guilty to conduct concerning Milestone, testified that Dr. Nelson required patients to pay their deductibles and co-pays before seeing them. She also testified that despite owning Milestone and Sandanna, she had very little involvement of the day-to-day operations of each hospice. While she remembered that Dr. Nelson, Dr. Todd Lee, and Dr. Brown were medical directors for her various hospices, she could not recall whether Dr. Nelson was medical director for Milestone. Ms. Livingston did not state

nor imply that Dr. Nelson knew of her or any other's unlawful conduct.

The Government called two of Charline Brandon's former employees to testify: Ms. Tameka Bolden and Sheila Craig. Ms. Bolden and Ms. Craig each testified that they embezzled funds from Ms. Brandon's former hospice agency, Genesis, before it was split up into Haven, North Haven, and Lion. Both admitted that Charline Brandon's hospices and employees would hold regular charting parties, falsifying patient records and documents. They each testified that in addition to Dr. Nelson, Charline Brandon also used other medical directors for the hospices, which included Dr. Brown, Dr. Warrington, and Dr. Patel. Ms. Craig testified that while Ms. Brandon paid her a small amount per referral to hospice, Dr. Nelson was only paid a regular set stipend for Ms. Brandon's hospices regardless of the number of patients certified. As with every other Government witness, neither Ms. Bolden nor Ms. Craig testified as to anything indicting that Dr. Nelson knew of any wrongdoing for Ms. Brandon's hospice agencies — or any other hospice or its employees.

In addition to hospice employees, the Government called Dr. Nelson's former employee, Mary Baldwin. Ms. Baldwin testified that when she worked for Dr. Nelson, he required that co-pays and deductibles be paid at the front desk before seeing a patient. Based on her recollection, Dr. Nelson limited the number of hospice evaluations to no more than two in the morning and two in the afternoon so that he could see his regular patients. Ms. Baldwin also testified that she recalled hospice employees coming to Dr. Nelson's office to drop of a folder of documents for him to sign and that they would soon after retrieve the folder once Dr. Nelson signed the documents. As with every witness who testified at trial, Ms. Baldwin presented no testimony establishing or inferring that Dr. Nelson knew of any wrongdoing by the hospices, their owners, or their employees.

To support its position that Dr. Nelson submitted false certifications to the further the conspiracy, the Government also called Dr. Anita Patel, the treating physician for Betty Jean Fox —one of the patients identified in the conspiracy portion of the indictment but not as a substantive count. Dr. Patel testified that Ms. Fox had died sometime between being placed on hospice and trial. She also testified that when she was treating Ms. Fox, she did not know that Ms. Fox had been admitted into hospice. Although she was Ms. Fox's treating physician, Dr. Patel did not know whether Ms. Fox was on hospice when she died nor whether she died from her initial hospice diagnosis. Instead, she offered only a difference as to a medical opinion, testifying that she did not believe that Fox was terminally ill when Dr. Nelson saw her. She further testified that when reviewing Ms. Fox's medical records, she realized that Dr. Karim signed as the certifying physician (where Dr. Karim and Dr. Warrington would typically sign in the named patients' chart) and that she trusted Dr. Karim medical opinions.

The bulk of the Government's case-in-chief revolved around its investigators, Agents Delgado and Loggins. Delgado testified that during their investigation, there was little indication that Dr. Nelson saw the patients identified in the indictment. He went on to say that the investigation and prosecution of Dr. Nelson was due to the hospices' high live discharge rates and Dr. Nelson robo-signing CTIs without meeting with patients. Delgado stated that he even though he was not an expert on Medicare regulations, based on his review of the patients' medical records, Dr. Warrington was the certifying physician for a majority of patients — not Dr. Nelson. Delgado presented no testimony to prove that Dr. Nelson knew of any wrongdoing on the part of the co-conspirators or their employees. Rather, Delgado's testimony established that Dr. Nelson's role was confined to being the certifying physician, without any knowledge of the practices, policies, or internal workings of the hospice agencies.

21

Loggins admitted that during his investigation, he was overworked and did most of the investigation himself, relying almost exclusively on spreadsheets and data produced by hospices and billings agencies and some assistance from Agent Delgado and another agent, Aldridge. He explained that when each hospice agency would bill, they would unilaterally enter the NPI number of a certifying physician, but failed to testify as to whether Dr. Nelson knew that the hospices were submitting his NPI number when submitting claims.

In sum, no witness, *including the co-conspirators*, implicated Dr. Nelson as a being a part of any conspiracy or underlying fraudulent conduct, let alone that he knew of the hospices', hospice owners', or hospice employees' scheme to defraud Medicare. Without Dr. Nelson's knowledge of the hospices' practices, there was insufficient evidence to conclude that he therefore acted with "bad purpose" as required to support a conspiracy conviction. Instead, the Government offered a patchwork of testimony and argument to imply that due to Dr. Nelson being a medical director for several hospices, he should have known that the hospices were engaged in unlawful conduct. Such an implication is contrary to the law and against the evidence. The Fifth Circuit has found that such a "proximity to the fraudulent activities" can only lead to an inference of knowledge where the defendant's proximity to fraudulent conduct directly exposes them to dishonest and fraudulent behavior. *See Willett*, 751 F.3d at 340 (finding that the defendant's presence while co-conspirators doctored codes on delivery tickets was sufficient to impute knowledge); *see also Thompson*, 761 F.App'x at 291 (finding that there was sufficient evidence to impute knowledge where the defendant, a medical marketer, would drive patients to their doctor, watch them move without difficulty, and then refer the patients to the doctor as needing the use of powered wheelchairs). In a more recent case, *United States v. Nora*, 988 F.3d 823 (5th Cir. 2021), the Fifth Circuit reversed a conviction for conspiracy to commit healthcare

fraud, conspiracy to pay illegal healthcare kickbacks, and aiding and abetting healthcare fraud after finding that the Government failed to present evidence establishing that the defendant "directly observed, or deliberately closed his eyes to, fraudulent behavior such that a rational juror could infer that he knew about the home health care provider's fraudulent conduct. *Id*. at 834.

## II. The Court should grant a new trial based on prosecutorial misconduct.

### A. The Government, through its agent, provided the grand jury and trial jury with materially false and misleading information based on its gross exaggeration of Dr. Nelson's medical director stipends.

Here, the Government's presentation of materially false and misleading information to the grand jury renders the indictment fatally flawed. Materially false testimony regarding one's knowledge of the subject matter of a grand jury investigation has an effect beyond its falsity; it also impedes the investigation of the grand jury. *United States v. Brown*, 459 F.3d 509 (5th Cir. 2006). "[A]s a general matter, a district court may not dismiss an indictment for errors in grand jury proceedings unless such errors prejudiced the defendant[ ]." *Bank of Nova Scotia v. United States*, 487 U.S. 250, 254, 108 S.Ct. 2369 (1988). Under Supreme Court precedent, "dismissal of the indictment is appropriate only 'if it is established that the violation substantially influenced the grand jury's decision to indict,' or if there is 'grave doubt' that the decision to indict was free from the substantial influence of such violations." *Id*. at 256 (quoting *United States v. Mechanik*, 475 U.S. 66, 78 (1986) (O'Connor, J., concurring)). In other words, "[w]hether or not prosecutorial misconduct prejudiced a defendant depends on whether it affected the grand jury's decision to indict." *United States v. Whitfield*, 590 F.3d 325, 359 (5th Cir. 2009); *see also United States v. Cessa*, 861 F.3d 121, 141 (5th Cir. 2017). A district court may dismiss an indictment with prejudice only where it has been shown that government misconduct or gross negligence in

prosecuting the case has actually prejudiced the defendant. *United States v. Fulmer*, 722 F.2d 1192 (5th Cir. 1983). "Mere error or oversight is neither gross negligence nor intentional misconduct." *United States v. Westoff*, 653 F.2d at 1050. When presented with the possibility of dismissing an indictment based on misleading testimony to a grand jury, the Fifth Circuit has developed a two-party inquiry: 1) did the government "knowingly "sponsor[ ]" false information before the grand jury; and 2) was that information material, that is, was the information "capable" of influencing the grand jury's decision. *Id*. at 770–72; *see also United States v. Cessa*, 861 F.3d 121, 142 (5th Cir. 2017).

During trial, Loggins spent considerable time discussing Dr. Nelson's medical director stipends. He emphasized that Dr. Nelson served as medical director for fourteen different hospices. When asked about Dr. Nelson's earnings as medical director, Loggins admitted that when testifying before the grand jury, he lied when stating that he did reviewed the accuracy of the amounts paid to Dr. Nelson from the named hospices. Instead, Loggins testified that his auditor wrongfully calculated the amounts paid to Dr. Nelson, even though he testified before the grand jury that he had checked the amounts' accuracy. He further admitted that the amounts paid to Dr. Nelson, based on the hospices named in the indictment, was approximately $105,000.00 *less* than what was presented to the grand jury, which in turn reduced the amount presented to the grand jury and in the indictment by nearly half. However, in an effort to inflate the amounts paid to Dr. Nelson, Loggins testified that the amounts paid to Dr. Nelson should have been approximately $442,705.00, which not only included the amounts paid to Dr. Nelson as a medical director for the hospices named in the indictment, but also included those amounts paid to Dr. Nelson for *all* hospices in which he was the medical director from 2009 to 2014 — several of which had no substantive allegations associated with them. Here, the Government's agent

effectively admitted to perjury, inflating the amounts paid to Dr. Nelson as medical director by approximately $105,000.00, and that the false information was material — the Government's case, both the grand jury and trial jury, centered largely around Dr. Nelson's payments as medical director. There can be no doubt that the Government sponsored the false information, especially in light of the Government's obligation to ensure that a grand jury is not misled, which in turn imposes a duty to confirm the accuracy of a witness's testimony. Additionally, by inflating the amount of medical director stipends to well over $400,000.00 by including stipends for hospices neither charged nor affiliated with the indicted counts, the Government created a reasonable likelihood that Loggins's misleading testimony would affect the judgment of the jury. Here, Agent Loggins' perjured statements to the grand jury warrant a dismissal of this case with prejudice or an evidentiary hearing to determine the level of impunity to the Government. As to his statements to the trial jury concerning Dr. Nelson's medical director stipends, the Government should not have permitted these facts to be presented to the jury, and its failure to prevent such testimony unfairly prejudiced Dr. Nelson.

**Conclusion**

For the reasons stated above, the Court should grant judgement of acquittals as to the remaining counts of the indictment or order a new trial.

Respectfully submitted this the 25th day of April 2022.

/s/Arthur H. Calderón
Arthur H. Calderón, MSB 103917
ATTORNEY FOR DEFENDANT

/s/Philip Mansour, Jr.
Philip Mansour, Jr., MSB 1857
ATTORNEY FOR DEFENDANT

## CERTIFICATE OF SERVICE

I hereby further certify that I have on this day electronically filed said

MEMORANDUM IN SUPPORT OF MOTION FOR JUDGMENT OF ACQUITTAL AND/OR NEW TRIAL

with the Clerk of the Court using the ECF filing system on April 25, 2022, which presumably

will send notification of such filing to Assistant United States Attorneys Clayton A. Dabbs,

Kimberly M. Hampton, and all other attorneys as may have entered an appearance in this cause.

So certified, this the 25th day of April 2022.

*/s/Arthur H. Calderón*
Arthur H. Calderón, MSB 103917
ATTORNEY FOR DEFENDANT


*/s/Philip Mansour, Jr.*
Philip Mansour, Jr., MSB 1857
ATTORNEY FOR DEFENDANT