## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF MISSISSIPPI

**UNITED STATES OF AMERICA**

**V.**                                    **CRIMINAL NO. 4:17-CR-131-DMB-JMV**

**SCOTT E. NELSON**

---

### GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR JUDGMENT OF ACQUITTAL AND/OR NEW TRIAL

---

### INTRODUCTION

In November 2017, the Grand Jury returned an Indictment charging the defendant, Dr. SCOTT NELSON, with one count of conspiracy to commit healthcare fraud (Count One, 18 U.S.C. §§ 1347, 1349) and twelve counts of healthcare fraud related to individual patients (Counts Two-Thirteen, 18 U.S.C. § 1347). The conspiracy count also charged Charline Brandon, Wendell Brandon, and Annette Lofton. *See* Indictment, Count One, ¶¶ 3-5. Count One also listed Roesha Sanders, Sandra Livingston, Lara Thompson, and Andre Kirkland as uncharged co-conspirators. *See* Indictment, Count One, ¶ 19. Charline Brandon, Wendell Brandon, and Annette Lofton each pled guilty to Count One, conspiracy to commit healthcare fraud. Roesha Sanders, Sandra Livingston, Lara Thompson, and Andre Kirkland each pled guilty to charges prior to the Indictment in this case.

The Indictment charged NELSON for his role as a medical director for hospice operations in North Mississippi that billed Medicare for hospice patients that were not actually terminally ill and not eligible for hospice care, resulting in the fraudulent payment of Medicare and Medicaid funds. *See* Indictment, Count One, ¶¶ 1-29. The Indictment charged the defendant with referring and certifying patients to hospice that were not terminally ill and not eligible for hospice services.

*See* Indictment, Count One, ¶¶ 14, 15, 20 & 24.  The Indictment specifically charged that it was part of the conspiracy that NELSON served as medical director for the hospice organizations owned by Charline Brandon, Annette Lofton, Sandra Livingston, and Andre Kirkland, including Genesis Hospice; Haven Hospice; North Haven Hospice; Lion Hospice; Zion Hospice; Milestone Hospice; Sandanna Hospice; and Revelation Hospice.  *See* Indictment, Count One, ¶¶ 1 & 14.  The Indictment also charged that it was part of the conspiracy that NELSON served as the medical director for numerous other hospice organizations, "including but not limited to, Angelic Hospice and Palliative Care Services, Inc.; Mercy Hospice and Palliative Care, Inc.; Word of Deliverance Hospice, Inc.; Divine Hospice and Palliative Care, LLC; Carols Hospice & Palliative Services of Shelby, Mississippi, Inc.; Delta Soul Medical, LLC; and Mid-Delta Hospice, Inc." *See* Indictment, Count One, ¶ 26.

After a two-week trial beginning on March 21, 2022, the jury found NELSON guilty of the conspiracy charge in Count One and the individual healthcare fraud charges in Counts Two, Three, Four, Five, Seven, Eight, and Ten.  The jury found NELSON not guilty of Counts Six, Nine, Twelve, and Thirteen.[1]  Following the conclusion of the government's case in chief, NELSON moved the Court for a Judgment of Acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure.  The Court denied the motion.  After presenting his own evidence and resting his defense case, NELSON renewed his motion, which the Court also denied.  NELSON now files this Motion for Judgment of Acquittal and/or New Trial pursuant to Rules 29 and 33 of the Federal Rules of Criminal Procedure.  The evidence clearly supported the jury's verdict in this case, and the defendant's motion should be denied.

---

[1] The government dismissed Count Eleven prior to trial.

## SUMMARY OF THE FACTS

Medicare and Medicaid are both healthcare benefit programs that pay for hospice care. To qualify for hospice care under Medicare and Medicaid, a patient must be certified by a physician as terminally ill with a life expectancy of six months or less if the terminal condition runs its normal course. At the end of a 90-day enrollment period, a physician may re-certify a patient for hospice care if the patient remains terminally ill. As Dr. Jacqueline Hampton explained to the jury, the decision to put a patient on hospice is emotional and exhausting. [2] It typically involves a lengthy conversation with the patient and the patient's family. As one would imagine, the patient often becomes depressed and the family emotional as the patient accepts the reality that they are at the end of their life and medical treatment will no longer help them get well.

The evidence at trial demonstrated a pattern over a period of years of blatant fraud against Medicare involving numerous hospice operations. Hospice employees typically recruited patients door to door and delivered them to NELSON in transport vans two, three, or even five at a time. The evidence at trial showed that the vast majority of these patients were not hospice appropriate and very rarely did a patient actually die while on hospice. NELSON signed Physician's Orders referring the patients to hospice and Certifications of Terminal Illness certifying the patients as terminally ill. Many of the patients he saw in person in his office. Many others he simply robo-signed their medical records with complete disregard for the actual condition of the patient or the content of the records. In return, these hospices paid NELSON $442,704.68 in medical director fees, not including the co-pays, past due balances paid, and Medicare Part B revenue he received for patient visits. *See* Gov't Exhibit 68. The hospices named in the Indictment received over $15 Million from Medicare based on NELSON'S referrals and certifications. *See* Gov't Exhibit 60.

---

[2] Since the official trial transcript is not available, the government's recitation of witness testimony is based on contemporaneous notes from the trial to the best of the undersigned attorney's knowledge of what each witness said.

The evidence showed that NELSON was at the center of this pattern of fraud, and the Court should deny his Motion for Judgment of Acquittal and/or New Trial.

Starting as far back at 2005, NELSON has served as medical director for hospice organizations in the Mississippi Delta, the owners of which have pled guilty to committing healthcare fraud and enrolling patients that were not terminally ill and not hospice appropriate. *See* Gov't Exhibits 2-10. Genesis, Haven, North Haven, Lion, and North Lion were operated by co-defendant Charline Brandon. Zion Hospice was operated by co-defendant Annette Lofton. Milestone Hospice and Sandanna Hospice were operated by co-conspirator Sandra Livingston. Revelation Hospice was operated by co-conspirator Andre Kirkland. Even NELSON'S defense counsel, in his cross-examination of David Delgado, referred to the hospice owners as "convicted felons."

As both Misty Day, the government's expert witness, and Wendy Overstreet, the defendant's expert witness, explained at trial, Medicare requires a certification of terminal illness signed by a Medical Doctor for each hospice patient. Misty Day testified that if two doctors signed the certification, then they were both acknowledging the patient's condition as terminally ill. Wendy Overstreet testified that the signature of two medical doctors was initially required, while one doctor could sign future re-certifications. The government presented medical records with numerous examples of both referrals and certifications containing NELSON's signature. *See* Gov't Exhibits 11-30.

Former Medicaid Fraud Control Unit Special Agent David Delgado testified that he and Department of Health and Human Services Office of Inspector General Special Agent Mike Loggins interviewed NELSON in August of 2014. During the interview, NELSON acknowledged that other doctors called him to complain that he had put their patients on hospice. NELSON

acknowledged to Agent Delgado and Agent Loggins that he had a duty to explain the terminal diagnosis to the hospice patients.

Several months after the interview, NELSON provided the government with documents described as minutes of meetings with various hospice organizations. *See* Gov't Exhibit 32. These meeting minutes reflect a meeting between NELSON and the hospice operators just a few days after he was interviewed by Agent Delgado and Agent Loggins. The minutes of these meetings clearly indicate that NELSON had been "robo signing" documents and that patients were not aware that they had been enrolled on hospice. For example, the following screenshot contains the minutes from NELSON'S meeting with Charline Brandon:



September 9, 2014

Meeting with Genesis Hospice (Haven and Lyon)
Members present: Nelson, Armstrong, Pearlie Bailey (sp?), Charline Breendon

1. Nelson stated that field auditors have complained regarding hospice agencies not informing patients or DNR and/or services
2. Nelson stated that if the hospice does not perform a background screen you must start
3. Genesis stated that 99% of patients have a H&P from their hospice
4. Nelson stated that all patients must be reevaluated at recertification period. If no decline is noted the patient must be removed from hospice rolls
5. Nelson informed Genesis that regular face-to-face IDT meeting must occur
6. Nelson informed Genesis that he wants to review all nurse practitioner cases
7. Nelson informed that hospice cannot make deductible or copay payments for patients
8. Nelson stated that robo signing will stop and that he and hospice staff member will now sit and discuss each patient
9. Genesis stated that most patients are moved to have Nelson as attending of record
10. Nelson informed Genesis that when in doubt fall back on guidelines and regulations of hospice
11. Genesis stated that many other practitioners are just mean and seem reluctant to enroll blacks onto hospice rolls
2. Nelson stated I sign them up because they meet the requirements

Excerpt from Gov't Exhibit 32

This meeting occurred in August of 2014; however, NELSON began working for Charline Brandon many years earlier in 2005. *See* Gov't Exhibit 2. This indicated that the practices of not telling patients they were being put on hospice, robo-signing documents, failing to verify that patients were in decline, and not seeing patients face to face had been occurring for many years prior to August 2014. These minutes corroborated Sheila Craig's testimony that Charline Brandon paid her employees for every patient they convinced to sign up for hospice.

In addition to the meeting with Charline Brandon, Exhibit 32 showed meetings with Zion Hospice, Word of Deliverance Hospice, Delta Soul Hospice, and Divine Hospice. Viewing the evidence in the light most favorable to the verdict, these meetings reflected practices and procedures that were nothing like real hospices that cared for dying patients and showed that NELSON had been directly involved in a pattern of fraud against Medicare for many years.

Annette Lofton, the owner of Zion Hospice and co-defendant in this case, testified that out of approximately eighty (80) patients on Zion Hospice, only two or three actually died on hospice. Medicare data showed that NELSON was the referring physician for sixty-one (61) patients. *See* Gov't Exhibit 60. Even if all three patients who died on Zion Hospice were referred by NELSON to Zion, 95% of NELSON'S Zion patients were still discharged alive from hospice. NELSON'S own expert, Wendy Overstreet, testified that in the operation of her hospice, North Sunflower, she had fifteen (15) patients die in one month out of a census of approximately forty-five (45) patients. Lofton testified that she relied on NELSON to determine whether or not hospice patients were eligible for hospice. She explained that they took patients from the Clarksdale area to NELSON'S office in Cleveland in transport vans as many as five (5) patients at a time. Dr. Warrington, who was referenced repeatedly by NELSON during trial and in his post-trial motion, did not work for Zion Hospice.

Lanetta Douglas worked for Zion Hospice and transported patients in vans from Clarksdale, Mississippi to NELSON'S office in Cleveland, Mississippi, sixty miles away. Douglas brought money to NELSON on behalf of Annette Lofton, sometimes in cash. The operation of Zion Hospice, along with the other hospices at issue in this case, was totally inconsistent with the operation of a real hospice that was actually caring for patients at the end of their lives.

Sandra Livingston and Lara Thompson testified regarding Milestone Hospice and Sandanna Hospice. Livingston testified to the effect of "Scott gave good patients." Thompson explained that she went door to door recruiting patients for hospice and transporting them, not to their actual doctor, but to either NELSON or Dr. Nate Brown.[3] Thompson explained that patients very rarely died and that she also worked at Delta Soul Hospice where the types of patients and practices were similar to Milestone Hospice and Sandanna Hospice. Thompson also testified that there was no distinction between the patients taken to NELSON versus Dr. Nate Brown, the patients were taken to whichever doctor was available. Dr. Warrington did not work with Milestone Hospice or Sandanna Hospice. Again, the testimony of Livingston and Thompson demonstrated practices and procedures that were blatantly fraudulent and nothing like a real hospice caring for dying patients.

The government also called patients to testify. These patients were able to walk to the witness stand with no assistance. They understood questions and communicated clearly with the jury. The jury, even without medical training, observed these witnesses in Court and saw that they were not appropriate for hospice in March 2022 during the trial, and they certainly were not terminally ill almost nine or ten years ago when NELSON referred and certified them for hospice care.

---

[3] Dr. Nate Brown pled guilty to healthcare fraud conspiracy in connection with Milestone Hospice

**ARGUMENT**

In evaluating a motion for judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure, the Court should "view all evidence, whether circumstantial or direct, in the light most favorable to the government, with all reasonable inferences and credibility choices to be made in support of the jury's verdict," to determine whether "a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Ford,* 558 F.3d 371, 375 (5th Cir. 2009); *see also United States v. Grant*, 683 F.3d 639, 642 (5th Cir. 2012). The jury "retains the sole authority to weigh any conflicting evidence and to evaluate the credibility of the witnesses." *United States v. Loe,* 262 F.3d 427, 432 (5th Cir. 2001). "The evidence need not exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt." *United States v. Moreno,* 185 F.3d 465, 471 (5th Cir. 1999); *see also Grant*, 683 F.3d at 642.

Rule 33 of the Federal Rules of Criminal Procedure allows a District Court to grant a new trial if the interest of justice so requires. Fed. R. Crim. P. 33(a). However, granting a new trial "should be exercised infrequently by District Courts, unless warranted by 'exceptional' circumstances." *United States v. Tarango*, 396 F.3d. 666, 672 (5th Cir. 2005). Motions for new trial are disfavored and must be reviewed with great caution. *United States v. Piazza*, 647 F.3d 559, 565 (5th Cir. 2011). A new trial should be granted only when the defendant has demonstrated an adverse affect on his substantial rights. *Piazza*, 647 F.3d at 565. While a Court, upon considering a motion for a new trial (as opposed to a motion for judgment of acquittal), may assess the credibility of the witnesses, the Court should not entirely usurp the jury's function or set aside the verdict simply because the Court believes a different result would have been more appropriate.

*Tarango*, 396 F.3d at 672. The evidence supported the jury's verdict on all counts of conviction, and the defendant's motion should be denied.

## I.  Count One: Conspiracy to Commit Healthcare Fraud (18 U.S.C § 1349)

To prove a conspiracy to commit health care fraud, the government must prove beyond a reasonable doubt that (1) two or more persons made an agreement to commit health care fraud; (2) that the defendant knew the unlawful purpose of the agreement; and (3) that the defendant joined in the agreement willfully, that is, with the intent to further the unlawful purpose. 18 U.S.C. §§ 1347, 1349; *United States v. Delgado,* 668 F.3d 219, 226 (5th Cir. 2012); *see also Grant*, 683 F.3d at 643. The agreement between conspirators may be silent and need not be formal or spoken. *United States v. Williams–Hendricks,* 805 F.2d 496, 502 (5th Cir. 1986); *see also Grant*, 683 F.3d at 643. "An agreement may be inferred from concert of action, voluntary participation may be inferred from a collection of circumstances, and knowledge may be inferred from surrounding circumstances." *United States v. Stephens,* 571 F.3d 401, 404 (5th Cir.2009) (internal citations and quotation marks omitted); *see also Grant*, 683 F.3d at 643; and *United States v. Martinez*, 921 F.3d 452, 467–68 (5th Cir. 2019).

As the defendant points out, the agreement cannot be "lightly inferred;" however, the Court clearly instructed the jury on the requirements of conspiracy, including the additional instructions requested by the defendant:

> However, *proof of an agreement to enter a conspiracy is not to be lightly inferred*. Mere presence at the scene of an event, even with knowledge that a crime is being committed, or the mere fact that certain persons may have associated with each other, and may have assembled together and discussed common aims and interests, does not necessarily establish proof of the existence of conspiracy. Also, a person who has no knowledge of a conspiracy, but who happens to act in way which advances some purpose of a conspiracy, does not thereby become a conspirator.

> Court's Jury Instruction C-2 (emphasis added).

9

> *Conspirators do not enter into an agreement by happenstance, and because an agreement is the essential element of conspiracy, an agreement to commit a crime cannot be lightly inferred.* Each party must have intended to enter into the agreement and the schemers must have had a common intent to commit an unlawful act. To establish the agreement element of conspiracy based on concerted actions between conspirators, the actions and the surrounding circumstances must be incriminating enough to warrant a finding that the government proved the existence of an agreement beyond a reasonable doubt. In addition, to establish the agreement element of conspiracy based on concerted actions between conspirators, the actions surrounding the defendant's and co-conspirators' conduct, taken together, must show they intentionally entered into an agreement.
>
> If you find that the government has failed to prove beyond a reasonable doubt a concerted action between the defendant and other co-conspirators in this case as set forth above to establish the agreement element of a conspiracy, then you should return a verdict of "not guilty" on Count 1 of the Indictment.

Court's Jury Instruction C-5 (emphasis added).

The Court instructed the jury in accordance with the cases relied upon by the defendant in his Motion for Judgment of Acquittal and/or New Trial. The Court must presume that the jury followed the instructions as given. *See Jones v. United States*, 527 U.S. 373, 394 (1999) ("The jurors are presumed to have followed these instructions"). Presuming that the jury followed the Court's instructions and viewing all the evidence in the light most favorable to the verdict, the jury did not lightly infer the defendant's agreement to the join the conspiracy, and the jury did not find that the defendant merely happened to act in a way which advanced the conspiracy.

NELSON actually entered into written agreements with each hospice listed in the Indictment. *See* Gov't Exhibits 2-9 & 62-67. Evidence at trial demonstrated that these hospices were operated as complete frauds. The jury found NELSON entered into an agreement to commit the crime of healthcare fraud and that he did so willfully with intent to further his unlawful purpose. The evidence fully supported the jury's finding, and the jury's verdict should be upheld by the Court.

Repeatedly throughout the trial and again in his Motion for Judgment of Acquittal and/or New Trial, NELSON claimed that the government did not prove that NELSON certified any of the patients as terminally ill. The jury clearly rejected this claim. The question for the jury was not whether NELSON certified each patient exactly as required by Medicare regulations. Nothing about the operations of the fraudulent hospices in this case satisfied Medicare regulations. The question for the jury was whether or not NELSON was a part of a conspiracy to defraud Medicare. NELSON participated in the conspiracy by referring patients to hospice, certifying patients for hospice, robo-signing documents, and all of the above.

The example of patient Earnestine Tillman is the best demonstration of the gross fraud committed by NELSON and his co-conspirators in this case. Medicare paid Charline Brandon, through Haven Hospice, $23,725.03 for Earnestine Tillman from August 14, 2012 to February 9, 2013. *See* Gov't Exhibit 38. NELSON's own billing records show that he saw Earnestine Tillman for a new patient visit on August 10, 2012. *See* Gov't Exhibit 37, p. 11. NELSON signed a prescription order for hospice for Earnestine Tillman on August 10, 2012, the same day as the initial office visit:



Excerpt from Gov't Exhibit 11

Just a few days after the office visit, on August 14, 2012, NELSON signed a Physician's

Order for hospice for Ms. Tillman:

Excerpt from Gov't Exhibit 23.

12

The prescription for hospice and the Physician's Order are referrals to hospice. NELSON'S physician order is dated the same date that the Medicare billing period for Ms. Tillman began. *See* Gov't Exhibit 38. In addition to the written referral to hospice signed by NELSON, he also signed an "IDT INITIAL PLAN OF CARE & CERTIFICATION STATEMENT" stating "The medical prognosis of 6 months or less, if the terminal illness runs its normal course, has been confirmed by Dr. Scott Nelson on this date: 8/14/12."



Excerpt from Gov't Exhibit 23.

In addition to the IDT INITIAL PLAN OF CARE & CERTIFICATION STATEMENT, NELSON signed a Hospice Certification of Terminal Illness also dated August 14, 2012. This Certification of Terminal Illness claims that Ms Tillman suffered from "Symptoms of Coma or persistent vegetative state secondary to stroke…" NELSON signed this form just days after seeing Ms. Tillman in his office:



Excerpt from Gov't Exhibit 23.

14

Earnestine Tillman testified at trial. She walked to the witness stand and clearly communicated with the jury. She explained to the jury that she saw NELSON in his office on one occasion. NELSON did not tell Ms. Tillman that he was referring her to hospice and did not talk to her about hospice or about what it meant to be terminally ill. Ms. Tillman testified that she took care of herself in her daily routine and that she was not dying or terminally ill. Ms. Tillman was formerly a nurse. She knew what hospice meant, and she testified that she had never been an appropriate hospice patient. She thought that her visit with NELSON was about home health. While Ms. Tillman had a stroke in the late 1990's, it was clear to the jury and to anyone that watched her testify that she was not hospice appropriate in 2022, much less ten (10) years earlier in August 2012.

NELSON saw Ms. Tillman in person and referred her to hospice on that same day without ever speaking to her about hospice or explaining to her a diagnosis of terminal illness. The Physician's Order signed by NELSON and the Certification of Terminal Illness signed by NELSON were obviously fraudulent. Earnestine Tillman is a clear example of NELSON'S direct participation in a blatant fraud against Medicare, as the jury confirmed with its guilty verdict. The evidence related to Ms. Tillman alone is sufficient to support the jury's guilty verdict as to Count One.

Every medical file admitted as evidence in this case contains a physician's order signed by NELSON, an IDT Initial Certification and Plan of Care signed by NELSON, and a Certification of Terminal Illness signed by NELSON.

NELSON called a handwriting expert in his defense. While the expert did call into question some of the signatures contained in the medical records, his report also confirmed many of NELSON'S signatures. *See*, *e.g.*, Defendant's Exhibit 36 pp. 6-9. The jury was free to accept or

reject the expert's testimony. *See United States v. Harper*, 450 F.2d 1032, 1037 (5th Cir. 1971) ("it is the jury's function to assess the credibility of the expert witnesses and the weight to be given to their testimony"). Viewing the evidence in the light most favorable to the verdict, the jury did not give weight to the testimony of the handwriting expert as it regards the counts in which the jury found NELSON guilty. Therefore, the Court should give no deference whatsoever to any claims of forgery by NELSON in the context of a post-trial motion.

NELSON repeatedly makes reference to the case *United States v. Ganji*, 880 F.3d 760 (5th Cir. 2018); however, as the Court explained in its ruling denying NELSON'S Rule 29 Motion at the close of the government's case, *Ganji* is clearly distinguishable from the facts in the present case. In *Ganji*, the government offered no witnesses that actually interacted with Dr. Ganji. *Ganji*, 880 F.3d at 770 ("The Government's witnesses did not testify that they worked in conjunction with Dr. Ganji."). In the present case, the majority of the government's witnesses interacted directly with NELSON. Each of the patients in the Indictment have either referrals or certifications, or both, signed by NELSON. The cooperators who testified in the case, Annette Lofton, Sandra Livingston, and Lara Thompson, all dealt directly with NELSON. Witnesses testified that they recruited patients door to door and took them directly to NELSON'S office and paid NELSON, sometimes in cash. Five of the patients who testified saw NELSON in his office. The evidence at trial showed that NELSON saw patients in person and referred and certified those same patients for hospice even though they clearly were not terminally ill and not appropriate for hospice.

Finally, NELSON had a clear financial motive for his role in the conspiracy. From 2009 to 2014, NELSON was paid $442,704.68 by the hospice operations named in the Indictment. *See* Gov't Exhibit 68. In 2013, NELSON was paid by nine (9) different hospice operations as medical

16

director for a total of $98,412.78. NELSON billed Medicare Part B when patients visited his office, and he had the hospice operations pay past due balances and co-pays related to patient visits. In other words, if the patient visits increased his expenses, then the Medicare part B and co-payments offset those increases. This made NELSON'S medical director income pure profit. In 2013, NELSON received $98,412.78 in medical director fees and had a total net income $141,653.66. His medical director stipends represented almost 70% of his profit in 2013.

The evidence supported the jury's guilty verdict on Count One, and the defendant's motion should be denied.

## II. Counts Two through Five; Seven, Eight, and Ten: Healthcare Fraud (18 U.S.C. § 1347)

Counts Two through Thirteen charged NELSON with aiding and abetting specific instances of Healthcare Fraud for individual patients. The jury convicted NELSON of Count Two (Mazie Anderson); Count Three (Earnestine Tillman); Count Four (Eddie Mitchell); Count Five (Linda Shields); Count Seven (Eva Bellmon); Count Eight (Turome Davis); and Count Ten (Jimmy Brown). The jury acquitted NELSON of Count Six (Eddie Clark); Count Nine (Marjorie Brown); Count Twelve (Dorothy Johnson); and Count Thirteen (Everleen Stewart).

"To prove health care fraud in violation of 18 U.S.C. § 1347(a), the Government was required to show that [the defendants] either (1) knowingly and willfully executed, or attempted to execute, a scheme or artifice to defraud a health care benefit program, or (2) knowingly and willfully executed, or attempted to execute, a scheme or artifice to obtain, by means of false or fraudulent pretenses, money under the control of a health care benefit program." *United States v. Mahmood*, 820 F.3d 177, 185-86 (5th Cir. 2016). "It is enough for criminal liability if a defendant 'associates with the criminal activity, participates in it, and acts to help it succeed.'" *United States v. Martinez*, 921 F.3d 452, 472 (5th Cir. 2019) (quoting *United States v. Delagarza-Villarreal*, 141

F.3d 133, 140 (5th Cir. 1997)). "[E]ach substantive count requires the government prove the submission or attempted submission of a separate fraudulent claim, since 'the health care fraud statute, § 1347, punishes executions or attempted executions of schemes to defraud, and not simply acts in furtherance of the scheme.'" *Id.* (quoting *United States v. Hickman*, 331 F.3d 439, 446 (5th Cir. 2003)).

In his Motion, NELSON continues to rely on *Ganji* suggesting that the government did no more than prove that NELSON engaged in "lax practices." The evidence in this case demonstrated much more than "lax practices." Viewing the evidence in the light most favorable to the verdict, the evidence showed that NELSON actively participated in a blatant fraud against Medicare, referring and certifying patients for hospice care that he saw in person in his office that clearly were not terminally ill and should not have been referred to hospice. The evidence supported the jury's guilty verdicts as to each individual count of healthcare fraud, and the defendant's motion should be denied.

### A.    Count Two: Mazie Anderson

Medicare paid $23,712 to Charline Brandon through Haven Hospice for hospice care for the period August 8, 2012 to February 15, 2013. *See* Gov't Exhibit 46. NELSON signed a Physician's Order referring Ms. Anderson to hospice dated August 8, 2012 as well as a Certificate of Terminal Illness and an IDT Plan of Care and Initial Certification dated August 8, 2012. *See* Gov't Exhibit 29. Ms. Anderson did not see NELSON in his clinic.

Mazie Anderson testified at trial. She travelled from Oklahoma to Greenville, Mississippi in order to testify, even getting stuck in a weather cancellation in Texas in the middle of the trip. Ms. Anderson testified that she takes care of herself and even explained that she cares for her five-year-old grandchild on a daily basis. She also stated that she has raised and continues to raise

18

twins from birth, who are now fourteen years old. It was obvious to the jury, with or without medical training, that Ms. Anderson was not remotely hospice appropriate in March 2022, much less almost ten years prior in August 2012.

Ms. Anderson's hospice admission is an example of NELSON'S willingness to robo-sign documents with complete disregard for the actual condition of the underlying patient. Charline Brandon used the multitude of documents signed by NELSON in Anderson's file to support her billing Medicare for alleged hospice services. The evidence supported the jury's guilty verdict as to Count Two.

### B.    Count Three: Earnestine Tillman

For the same reasons explained in detail in the previous discussion of the conspiracy charge, the evidence clearly supported the jury's guilty verdict as to Count Three. NELSON saw Ms. Tillman in person just a few days before referring her to hospice and certifying her as terminally ill for coma-like symptoms. Ms. Tillman clearly was not terminally ill and certainly was not comatose, as shown by her in-person testimony at trial.

### C.    Count Four: Eddie Mitchell

Medicare paid Charline Brandon, through Haven Hospice, $47,993 for hospice care for Eddie Mitchell for the period March 14, 2014 through May 25, 2015. *See* Gov't Exhibit 40. According to his own billing records in addition to Medicare Part B billing records, NELSON saw Mr. Mitchell in his clinic for a new patient visit on May 30, 2014. *See* Gov't Exhibits 37 & 51. NELSON signed a Physician's Order referring Mr. Mitchell to hospice dated June 11, 2014. *See* Gov't Exhibit 25. NELSON signed an IDT Plan of Care and Initial Certification dated March 14, 2014 and a Certification of Terminal Illness dated November 7, 2014. *See* Gov't Exhibit 25.

19

NELSON'S reaction to Mr. Mitchell's medical records is interesting for several reasons. In his Motion for Judgment of Acquittal and/or New Trial, NELSON states "Mr. Mitchell testified that Dr. Karim was the original certifying physician and his medical records showed that he visited Dr. Nelson two months *after* Dr. Karim certified him for hospice…" *See* Defendant's Motion for Judgment of Acquittal and/or New Trial, p.7. Indeed, Dr. Karim signed a physician's order referring Mr. Mitchell to hospice and signed an IDT Plan of Care and Initial Certification as the Attending Physician.



PHYSICIAN'S ORDER

Physician: Please Sign, Date and Return Within 48 Hours

**PLEASE NOTE:**
The Original is sent to MD and the copy is retained in the chart, until the signed original returns.

## IDT INITIAL PLAN OF CARE & CERTIFICATION STATEMENT

Pt. Name: Eddie Lee Mitchell   MRN: _____

| | |
|---|---|
| Diagnosis(s) (Primary and Secondary)<br>Respiratory failure, Severe Asthma,<br>HTN, Hyperlipidemia, Glaucoma | Mental Status (check one)<br>✓ Alert ___ Lethargic ___ Confused<br>___ Semi-comatose ___ Comatose |
| Prognosis and Rehabilitation Potential<br>Guarded Potential for rehab | Diet<br>↓ Na⁺ | Medications and Treatment<br>[ See Admission Orders ] |
| Functional Status<br>Limited functional status | Safety Precautions<br>✓ 24 Hour supervision<br>___ other _____ | |

Supplies
✓ Gloves ___ Foley Cath ___ Irrigation Set ___ Enema ___ Blue Pads ✓ ___ Briefs ___ Duoderm
___ Transparent Dressing ✓ Other Any other Supplies prn

Durable Medical Equipment
✓ Oxygen ___ Commode ___ Hospital Bed ___ Wheel chair ___ Walker ___ Trapeze ___ Cane ✓ Nebulizer
___ Over bed Table ___ Suction set up ___ Air Mattress Pad ✓ Other Any other DME prn

Disciplines/Persons Persons Participating In Care Plan Development
✓ MD ✓ Skilled Nursing ✓ Bereavement ✓ Social Services ✓ Volunteer ✓ Patient ✓ Family
✓ other Chaplain, HHA

Frequency of Visits

Skilled Nursing 2x per week ___ Social Services 1x/month HHA —0—
Volunteer PRN ___ Clergy 1x per month MD PRN

DNR Authorized? ✓ Yes ___ No; Living Will? ___ Yes ✓ No; POA for Healthcare? ___ Yes ✓ No

### CERTIFICATION STATEMENT

The medical prognosis of 6 months or less, if the terminal illness runs its normal course, has been confirmed by
Dr. Parvez Karim on this date: March 14, 2014 by :
alpha D. Richardson

Admission Approval by IDT? ✓ Yes ___ No
Hospice Medical Director/Associate will serve as primary Physician? ✓ Yes ___ No
Attending Physician and Hospice Medical Director agree with certification to Hospice? ✓ Yes ___ No
Evaluate Plan of Care every 2 weeks. Nurse Initials AR

| RN's Signature<br>alpha w. richard Rn | Social Worker's Signature<br>Betty Culberson SW | Chaplain's Signature<br>Neil A. Watson Chp |
|---|---|---|
| Date 3-14-14 | Date 3-14-14 | Date 3-14-14 |
| Medical Director's Signature<br><br>Date 3-14-14 | Attending Physician's Signature<br><br>Date 3-14-14 | |

Excerpts from Gov't Exhibit 25.

NELSON claims that Dr. Karim certified Mr. Mitchell for hospice, but Dr. Karim signed

documents for Eddie Mitchell exactly the same way that NELSON signed documents for every

other patient listed in the Indictment, the same patients that NELSON claims he did not certify. NELSON cannot claim on the one hand, that he did not certify any of the patients for hospice because he only signed a Physician's Order and Certification of Terminal Illness as the attending physician and then claim on the other hand that Dr. Karim certified Eddie Mitchell because he signed a Physician's Order and a certification as his attending physician. Furthermore, NELSON signed the March 14, 2014 certification as the medical director, which is exactly what Dr. Warrington did on the other Charline Brandon patients in the indictment. Over and over again throughout the trial, NELSON claimed that Dr. Warrington certified the patients as terminally ill because his signature was first and he signed as the medical director when that is exactly where NELSON'S signature appears on the first certification in Eddie Mitchell's records.

In addition, NELSON signed Physician's Orders referring Mr. Mitchell to hospice dated June 11, 2014 and December 5, 2014. *See* Gov't Exhibit 25. NELSON was also the first doctor to sign the Recertificate of Terminal Illness dated November 8, 2014, as seen by the document in his own files that showed his signature prior to any other doctor signing the form.

22

Recertification
Plan of Care
Certification of Terminal Illness

**Patient Name: Eddie Mitchell**

| Patient Name: | Address: |
|---|---|
| **Eddie Mitchell** | **307 Peyton Drive** |
| | **Leland, MS 38756** |
| **Physician Name:** | |
| **Dr. Scott Nelson** | |
| **Verbal Order Received:**    Date: 11/08/14 | Time: |

| Re-certification for Hospice Benefit Period# _____    Beginning: 11/08/14    thru: 01/06/15 |
|---|
| Physician's Order:  COPD |
| 1.  The above named patient continues to require Hospice Care.  The patient's appropriateness for hospice care has been reviewed.  The Plan of Care has been reviewed and updated as appropriate.  Further review by the Interdisciplinary Team will be conducted at least two times per month.  The attending physician will review at time of recertification and as needed. |
| *(Hospice will cover only mediations and equipment used to relieve symptoms directly attributed to the terminal diagnosis.)* |
| 3.  DNR      Yes      **x**      No |
| 4.  Services and Frequency:  Skilled Nurse:  2x week/PRN          HHA:  PRN<br>                                        Social Services: 1x month/PRN      Pastoral Care: 1x month/PRN<br>                                        Volunteer Services: PRN |
| 5.  I certify that the above-named patient is considered terminally ill with a life expectancy of six (6) months or less if the illness runs its normal course. |



Excerpt from Gov't Exhibit 13.

Eddie Mitchell testified at trial that he did see Dr. Nelson in his clinic in Cleveland.  He

thought he went to NELSON to be treated for asthma.  NELSON did not talk to him about hospice

or explain to him what it meant to be terminally ill.  He takes care of himself on a daily basis.  Mr.

23

Mitchell drives himself and lives alone. He was clearly not terminally ill in March 2022 when he testified, and he was not terminally ill in 2014 when NELSON saw him in his clinic. NELSON signed a referral for hospice and a certification of terminal illness just days after seeing him in person in his clinic. The evidence supported the jury's guilty verdict as to Count Four.

### D.  Count Five: Linda Shields

Medicare paid $22,887 to Charline Brandon through Haven Hospice for hospice care for the period July 24, 2012 to January 13, 2013. *See* Gov't Exhibit 45. NELSON signed a Physician's Order referring Ms. Shields to hospice dated July 24, 2012, as well as a Certificate of Terminal Illness and an IDT Plan of Care and Initial Certification dated July 24, 2012. *See* Gov't Exhibit 29. Ms. Shields did not see NELSON in his clinic.

Linda Shields testified at trial. She thought she was being signed up for home health. She takes care of herself on a daily basis. She clearly was not hospice appropriate when she testified in March 2022 and certainly was not hospice appropriate in July 2012.

The report of NELSON'S handwriting expert states that he did sign the Physician's Order, the IDT Plan of Care and Initial Certification, and the Certification of Terminal Illness. *See* Defendant's Exhibit 36 pp. 9-11. Ms. Shields' hospice admission is another example of NELSON'S willingness to robo-sign documents with complete disregard for the actual condition of the underlying patient. Charline Brandon used the multitude of documents signed by NELSON in Ms. Shields' file to support her billing Medicare for alleged hospice services. The evidence supported the jury's guilty verdict as to Count Five.

24

E.     **Count Seven: Eva Bellmon**

Medicare paid $23,785 to Charline Brandon through North Haven Hospice for hospice care for the period September 12, 2012 to March 15, 2013. *See* Gov't Exhibit 41. NELSON signed a Physician's Order referring Ms. Bellmon to hospice dated September 12, 2012 as well as a Certificate of Terminal Illness and an IDT Plan of Care and Initial Certification dated September 12, 2012. *See* Gov't Exhibit 14. Ms. Bellmon saw NELSON in his clinic for a new patient visit on May 6, 2013. *See* Gov't Exhibit 37, p. 12.

Ms. Bellmon testified at trial. She remembered being taken to a doctor's office in a van but did not even remember her visit with NELSON in May 2013. No one ever told Ms. Bellmon that she had been on hospice or that she was being placed on hospice care. She takes care of herself on a daily basis and was clearly not hospice appropriate when she testified in March 2022, much less in 2012 when NELSON referred her to hospice and signed her certification of terminal illness. NELSON might argue that he did not see her in person until after the billing period for Ms. Bellmon; however, he did not tell her that she had been on hospice or talk to her about a terminal illness. He had already signed documents referring her to hospice and certifying her as terminally ill. If NELSON had been trying to make even a half-hearted attempt to actually provide care to Ms. Bellmon, he would have spoken to her about her hospice diagnosis. He did not because he was directly involved in this scheme to defraud Medicare. The evidence supported the jury's guilty verdict as to Count Seven.

F.     **Count Eight: Turome Davis**

Medicare paid $31,512 to Charline Brandon through North Haven Hospice for hospice care for the period December 27, 2012 to August 24, 2013. *See* Gov't Exhibit 47. NELSON signed a Physician's Order referring Mr. Turome Davis to hospice dated December 27, 2012 and May 9,

2013 as well as a Certificate of Terminal Illness and an IDT Plan of Care and Initial Certification dated December 27, 2012 and a re-certification dated May 27, 2013 and June 25, 2013. *See* Gov't Exhibit 30. NELSON saw Mr. Davis in his clinic for a new patient visit on May 9, 2013. *See* Gov't Exhibit 37, p. 13.

Catherine Davis testified at trial that she helps Turome Davis with his affairs. Catherine Davis is not related to Turome Davis but explained that she takes him to the doctor and helps him with his bills. She explained that Turome Davis lives by himself in Greenville. She stated "Turome takes care of Turome" regarding his daily routine and his daily needs such as meals and personal hygiene. Catherine Davis takes responsibility for driving Turome Davis to his doctor's appointments. She explained that NELSON was not and has never been Turome Davis' primary care doctor. She testified that she had no knowledge of Turome Davis' visit to NELSON'S office in Cleveland until she saw a bill from NELSON'S clinic, Cleveland Family Medical Clinic. Despite her name and phone number being listed in his medical records as his primary caregiver and next of kin, no one informed Catherine Davis that Turome Davis had been diagnosed as terminally ill and placed on hospice care. Catherine Davis testified that Turome Davis had never been diagnosed with Alzheimer's disease.

Viewing the evidence in the light most favorable to the verdict, Catherine Davis' testimony established that Turome Davis was not terminally ill in 2022 when she testified and he was not terminally ill in 2012 when he was placed on hospice. NELSON saw Turome Davis in his office. NELSON signed recertifications of terminal illness for Turome Davis after he personally saw him in his office. The fact that NELSON signed a Physician's Order and multiple certifications of terminal illness claiming that Turome Davis had Alzheimer's disease, yet made no attempt to speak to his primary caregiver and next of kin demonstrates a total disregard by NELSON of the patient's

26

well-being.  There is no explanation for admitting a patient to hospice for Alzheimer's disease without speaking to the patient's family or legal guardian.  Turome Davis is yet another example of NELSON'S direct participation in a blatant scheme to defraud Medicare, and the evidence supported the jury's verdict as to Count Eight.

G.      **Count Ten: Jimmy Brown**

Medicare paid $24,968 to Charline Brandon through Lion Hospice for hospice care for the period March 8, 2013 to September 15, 2013.  *See* Gov't Exhibit 44.  NELSON signed a Physician's Order referring Mr. Jimmy Brown to hospice dated March 8, 2013 as well as a Certificate of Terminal Illness dated March 5, 2013 and an IDT Plan of Care and Initial Certification dated March 8, 2013.  *See* Gov't Exhibit 26.  Mr. Brown did not see NELSON in his clinic.

Jimmy Brown testified at trial.  Mr. Brown has been a bricklayer for over forty years and is still, in 2022, actively working as a bricklayer.  In 2013, when NELSON signed a Physician's Order referring Mr. Brown to hospice, he was actively working as a bricklayer.  It was very clear to anyone who saw Mr. Brown testify that he was not hospice appropriate in March 2022 and certainly not in March 2013.  Mr. Brown had no idea that he had been put on hospice.

The report of NELSON'S handwriting expert states that he did sign the Physician's Order, the IDT Plan of Care and Initial Certification, and the Certification of Terminal Illness.  *See* Defendant's Exhibit 36 pp. 6-9.  Jimmy Brown is a perfect example of why robo-signing is a problem and why robo-signing is an essential act in furtherance of the scheme to defraud Medicare.  Charline Brandon needed a doctor who would sign paperwork for her without asking any questions.  NELSON was that doctor for Charline Brandon.  He signed the Physician's Order and

27

the certficiations of terminal illness for Jimmy Brown with complete disregard of Mr. Brown's actual condition. The evidence supported the jury's guilty verdict as to Count Ten.

### III. The Jury's Verdict is not Internally Inconsistent

Citing no caselaw, NELSON claims that his convictions cannot be reconciled since the jury found him guilty of some counts and not guilty on others. NELSON'S claim has no merit and is not supported by the law.

The only question for the Court is whether the evidence supported the counts of conviction. If the evidence supports NELSON'S counts of conviction, then the not guilty counts have no effect on the verdict. "Even if the jury's verdicts were inconsistent, [the defendant] would not be entitled to reversal of his conviction." *United States v. Reid*, 268 F.3d 1063 (5th Cir. 2001)("As long as there is sufficient evidence to support the finding of guilt on the carjacking count, the jury's acquittal on the brandishing count is not a bar to conviction."); *see also United States v. Hays*, 48 F. App'x 103 (5th Cir. 2002) ("The jury's verdict on counts one and two of the indictment, even if inconsistent, does not warrant reversal because the evidence is sufficient to sustain Hays's conviction as to the conspiracy count, the charge for which Hays was convicted").

Even if two counts are related factually, a not guilty verdict on one count would not necessarily bar a guilty verdict on another count. *United States v. Straach*, 987 F.2d 232, 240 (5th Cir. 1993). The evidence supported the counts of conviction in this case. The not guilty counts have no impact on the guilty counts. There is no support for NELSON'S position, and his motion should be denied.

IV.     **NELSON'S Claim of Prosecutorial Misconduct has No Merit**

Finally, NELSON claims that he must be granted a new trial on the basis that the government provided the Grand Jury and the trial jury "materially false and misleading information based on its gross exaggeration of Dr. NELSON's medical director stipends." NELSON is primarily complaining about the figures in Government Exhibit 68.

A.     **The Error in the Indictment was Unintentional and Did Not Affect the Grand Jury's Decision**

"[A]s a general matter, a district court may not dismiss an indictment for errors in grand jury proceedings unless such errors prejudiced the defendant[ ]." *Bank of Nova Scotia v. United States*, 487 U.S. 250, 254 (1988). "[D]ismissal of the indictment is appropriate only 'if it is established that the violation substantially influenced the grand jury's decision to indict,' or if there is 'grave doubt' that the decision to indict was free from the substantial influence of such violations." *Id.* at 256; *see also United States v. Cessa*, 861 F.3d 121, 141 (5th Cir. 2017). "Whether or not prosecutorial misconduct prejudiced a defendant depends on whether it affected the grand jury's decision to indict." *United States v. Whitfield*, 590 F.3d 325, 359 (5th Cir. 2009). "[M]ere error or oversight is neither gross negligence nor intentional misconduct." *United States v. Fulmer*, 722 F.2d 1192, 1195 (5th Cir. 1983). The Indictment in this case contained an error describing the amounts paid by various hospice operations to NELSON. This error was not intentional, and it did not mislead the Grand Jury. There is no indication this error influenced the Grand Jury's decision to indict, and the defendant's motion should be denied.

The Indictment contained an error in the amounts listed in Count One, ¶ 28. Agent Loggins explained this error to the jury in his direct examination. NELSON's defense counsel cross-examined Agent Loggins on the error and regarding his testimony before the Grand Jury. The government offered proof of correct amounts at trial based on NELSON's own profit and loss

statements.  When he presented his defense, NELSON did not present any alternative calculations of his medical stipends.

However, the sum total of the figures in the Indictment is actually less than the total amount proven by the government at trial.  The total of the payments in Paragraph 28 of Count One equals $289,369 and relates to Genesis, Haven, Lion, Zion, Sandanna, Milestone, and Revelation.  For those same hospices, in Government Exhibit 68, the total is $297,232.76.  There is no indication that this error in the Indictment had any bearing on the Grand Jury's decision to indict.  The government offered ample evidence to support the Grand Jury's decision to indict and subsequently offered substantial evidence at trial to support the Trial Jury's verdict.  The government did not provide materially false and misleading information to the Grand Jury.

###  B.     The Government Did Not Exaggerate NELSON's Medical Director Stipends

The government also did not grossly exaggerate NELSON'S medical director stipends. The government summarized NELSON'S own calculations.  Government's Exhibit 1 is a series of profit and loss statements for NELSON'S clinic, Cleveland Family Medical Clinic.  The profit and loss statements were not prepared by the government.  NELSON provided the profit and loss statements to the government in response to a Grand Jury subpoena.  Government's Exhibit 68 is simply a summary of the figures in Government's Exhibit 1.  The amounts in Government Exhibit 68 were not created by the government but were actually created by NELSON and provided to the government.  It is completely baseless to now suggest that admission of this evidence at trial was prosecutorial misconduct.

NELSON claims that the government inflated the amount of his stipends by "including stipends for hospices neither charged nor affiliated with the indicted counts."  *See* Motion for Judgment of Acquittal and/or New Trial, p.25.  This simply is not correct.  Each hospice listed on

30

Government's Exhibit 68 is explicitly named in the Indictment.  *See* Indictment, Count One, ¶¶ 1, 14 & 26.  Presumably, NELSON is referring to the hospices named on Exhibit 68 that are not connected to patients listed in the Indictment; however, the conspiracy charge in Count One broadly includes the fact that NELSON was the hospice medical director for many different hospices, including every hospice listed on Exhibit 68.  Viewing the evidence in the light most favorable to the verdict, the fact that NELSON was the medical director for fifteen different hospices, many at the same time, shows that he was participating in this scheme to defraud Medicare, not to take care of patients, but to maximize his income.

Every hospice listed on Government's Exhibit 68 is named in the Indictment.  The amounts in Government's Exhibit 68 are taken directly from NELSON'S own profit and loss statements and are actually higher, as a total amount, than the amounts in the Indictment.  The government did not mislead the trial jury, and the error in the Indictment had no effect whatsoever on the Grand Jury's decision to indict.  NELSON'S claims of prosecutorial misconduct have no merit whatsoever, and his motion should be denied.

## CONCLUSION

For the foregoing reasons, the defendants Motion for Judgment of Acquittal and/or New Trial should be denied.

Dated this the 6th day of May, 2022.

Respectfully submitted,
CLAY JOYNER
United States Attorney
MS Bar No. 10316

By:  */s/ Clayton A. Dabbs*
CLAYTON A. DABBS
Assistant United States Attorney
MS Bar No. 101537
900 Jefferson Avenue, Oxford MS 38655

31

## <u>CERTIFICATE OF SERVICE</u>

I, CLAYTON A. DABBS, Assistant United States Attorney for the Northern District of Mississippi, hereby certify that I have this day electronically filed the foregoing GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR JUDGMENT OF ACQUITTAL AND/OR NEW TRIAL with the Court using the ECF system which sent notification of such filing to the following:

*Philip Mansour, Jr.*
phil@mansouradams.com

Arthur H. Calderon
arthur@msdeltalaw.com

This the 6th day of May, 2022.

/s/ Clayton A. Dabbs
CLAYTON A. DABBS
Assistant United States Attorney