**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI**

**UNITED STATES OF AMERICA**

**V.**                                                             **NO. 4:17-CR-131-1**

**SCOTT E. NELSON**

**MEMORANDUM OPINION**

A jury convicted Scott Nelson of one count of conspiracy to commit healthcare fraud and seven counts of healthcare fraud. Nelson filed a "Motion for Judgment of Acquittal and/or New Trial" and, months later, an "Addendum" raising more arguments. Because there was sufficient trial evidence to support the jury verdict and because Nelson has not shown he was prejudiced by any alleged errors at trial (or before the grand jury), both acquittal and a new trial are denied.

**I**
**Procedural History**

On November 3, 2017, Scott E. Nelson, Charline Brandon, Wendell Brandon, and Annette Lofton were charged in a thirteen-count indictment with healthcare fraud and with conspiracy to commit healthcare fraud. Doc. #1. Regarding Nelson, who was named in all counts, the indictment alleged that "[f]rom on or about January 2005 through on or about March 2015," Nelson, in his position as medical director for multiple hospices owned and operated by the Brandons and Lofton, "certified numerous patients as terminally ill and qualified for hospice when in truth and in fact, the patients were not terminally-ill and did not qualify for hospice," and that Nelson knew his codefendants and other unnamed individuals "would submit fraudulent claims to Medicare and Medicaid [through the hospices] and receive payments from Medicare and Medicaid based on his false certifications and referrals." *Id.* at PageID 1, 6–7. The indictment further alleged that "in addition to his monthly medical director's fee, [Nelson] received numerous payments from

hospice providers for patient co-pays and past due amounts owed by patients." *Id.* at PageID 8. Based on these factual allegations, the indictment charged Nelson with one count of conspiracy to commit healthcare fraud in violation of 18 U.S.C. § 1349 and twelve counts—each linked to a specific patient—of healthcare fraud in violation of 18 U.S.C. § 1347. *Id.* at PageID 9–12.

Charline, Wendell,[1] and Lofton each pled guilty to the conspiracy to commit healthcare fraud charge. *See* Docs. #73, #89, #92. The remaining counts against Wendell and Lofton were dismissed upon their sentencing pursuant to their respective plea agreements. *See* Doc. #213 at 1; Doc. #266 at 1. Charline died following her guilty plea and the Court granted the government's motion to dismiss the indictment against her due to her death. Doc. #248. Consequently, only Nelson was left to proceed to trial.[2]

On the government's motion a week before trial, the Court dismissed Count Eleven (one of the healthcare fraud counts) against Nelson. Doc. #300. Trial commenced on March 21, 2022. Doc. #302. On April 4, 2022, the jury convicted Nelson on the conspiracy to commit healthcare charge (Count One) and on seven of the remaining healthcare fraud charges as to patients M.A. (Count Two), E.T. (Count Three), E.M. (Count Four), L.S. (Count Five), E.B. (Count Seven), T.D. (Count Eight), and J.B. (Count Ten).[3] Doc. #308.

On April 26, 2022, Nelson filed a "Motion for Judgment of Acquittal and/or New Trial."[4]

---

[1] The Brandons are referenced by their first names for clarity.

[2] Pursuant to a plea agreement with the government, *see* Doc. #150, Nelson waived indictment and pled guilty to a one-count information which charged that he "[f]rom on or about June 2010 until on or about March 2015, … having knowledge of the commission of a felony … did conceal the same … in violation of Title 18, United States Code, Section 4." Docs. #149. Following the Court's rejection of the plea agreement, Nelson withdrew his guilty plea. Doc #216.

[3] Nelson was allowed to remain out of custody pending his sentencing under the same bond granted after his arrest.

[4] Nelson requested and received an extension to file a post-judgment motion. Doc. #315. He timely filed a post-judgment motion on April 25, 2022. Doc. #318. However, because he attached his supporting memorandum as an exhibit to the motion in violation of the Local Rules, the Court denied the motion and allowed Nelson two days to refile it in accordance with the Local Rules. Doc. #319.

Doc. #320. On October 26, 2022, while his post-trial motion was pending, Nelson filed an "Addendum to Defendant's Motion for Judgment of Acquittal and/or New Trial." Doc #332. The government responded in opposition to both the motion and the Addendum. Docs. #322, #334. The Court denied the motion and the Addendum on January 11, 2023. Doc. #336. This opinion explains why.

## II
## Standards

Federal Rule of Criminal Procedure 29(a) provides that "[a]fter the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." "Evidence is sufficient to support a conviction so long as any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Gas Pipe, Inc.*, 997 F.3d 231, 240 (5th Cir. 2021) (internal quotation marks omitted). In applying this standard, "the court views all evidence, whether circumstantial or direct, in the light most favorable to the government, with all reasonable inferences and credibility choices to be made in support of the jury's verdict." *Id.* (cleaned up).

Motions for new trials are governed by Federal Rule of Criminal Procedure 33(a). Under Rule 33(a), a "court may vacate any judgment and grant a new trial if the interest of justice so requires." "Broadly speaking, Rule 33 is exercised in two situations. One is when error infects the trial—perhaps the erroneous admission or exclusion of evidence, inflammatory comments by a lawyer, or faulty jury instructions. The other is when the court believes the evidence weighs heavily against the verdict." *United States v. Crittenden*, 46 F.4th 292, 296 (5th Cir. 2022). "[A]ny error of sufficient magnitude to require reversal on appeal is an adequate ground for granting a new trial." *United States v. Wall*, 389 F.3d 457, 474 (5th Cir. 2004).

### III
### Trial Evidence

At trial, thirty witnesses testified and numerous documents were admitted into evidence. *See* Docs. #303, #304. The trial evidence generally falls into the categories of hospice care, Medicare and Medicaid billing procedures related to hospice care, Nelson's involvement with various hospices, practices at Nelson's medical clinic, the investigation of Nelson and his practice, and the patients who received hospice care named in the relevant counts of the indictment.

#### A. Medicare, Medicaid, and Hospice

#### 1. David Delgado

David Delgado is a former criminal investigator for the Mississippi Attorney General's Medicaid Fraud Control Unit involved with investigating Nelson. Delgado testified that patients must elect to receive hospice care which, upon their election, indicates "they have given up th[e] right to be cured and they have agreed to just be treated as far as the symptoms go." Before admitting a patient for hospice care, a hospice provider needs an election from the patient and a doctor's certification that the patient is terminally ill with six months to live. The certification must include a written statement and the physician's signature. Without a certification, a physician's order is insufficient for a hospice provider to bill Medicare.

For "at home" hospices, medical doctors are often employed as medical directors who essentially oversee all patient care and, most importantly, are responsible for certifying that a patient is terminally ill with less than six months to live. An attending physician or primary physician is "generally the physician [who] has the most knowledge about the care and history of a patient."

#### 2. Misty Day

Misty Day works for Qlarant, a private company contracted by the government that assists

in identifying potential fraud, waste, and abuse of Medicare in seven states, including Mississippi. Without objection by Nelson, Day was qualified as an expert "to define hospice terms related to hospice and record requirements to go along with hospice regulations."

Day testified that Medicare operates on a trust-based system and claims are paid without reviewing medical records. Before billing Medicare for hospice care, a provider should have documentation to support a terminal diagnosis, an election of benefits from the patient or proper representative, and a certification of terminal illness. Prior to 2014, an election of benefits was not required. The "main part" of the certification "is to acknowledge that the attending physician and the medical director have consulted with one another and that they are both in the understanding that they have the knowledge of this terminal illness." Both the attending physician, if there is one, and the medical director sign the certification of terminal illness. When "two physicians are both signing the form, they are acknowledging that they are aware of the medical condition and the terminal illness and the plan for hospice." A physician can rely upon the opinions and examinations of his nurse practitioner but "if [the doctor] is going to sign after the person, they need to make sure that the information presented is true and accurate to the best of their knowledge."

### 3. Wendy Overstreet Gore

Without objection by the government, Wendy Overstreet Gore was qualified as an expert in the hospice industry. Gore testified that two doctors are required to sign the initial certification of terminal illness. Typically, nurses would perform a "history and physical" on the patient and then the doctor would "read everything," compare it with the written narrative on the certificate of terminal illness, and indicate his agreement that the patient was terminal. "[N]ine times out of ten the primary care [physician] never sees the patient" but signs the certification after reviewing the

5

written narrative and patient history. The physician who wrote the narrative was the certifying physician. Based on Gore's personal experience as a hospice provider, it was not unusual for patients to die—she had nine to fifteen patients (out of approximately forty-five) die in one month.

### 4. Dr. Kenneth Kellough

At the government's request, Dr. Kenneth Kellough was qualified as an expert in his role as a hospice medical director.[5] In that role, Kellough would review medical records requested from a patient's primary care physician and perform his own exam to determine whether a patient was eligible for hospice care.

### B. Nelson's Hospice Involvement

Nelson served as the medical director for multiple hospices, including Genesis Hospice, Haven Hospice, Lion Hospice, Zion Hospice, Angelic Hospice, Carol's Hospice, Delta Soul Hospice, Divine Hospice, Mercy Hospice, and Word of Deliverance Hospice. From 2009 to 2014, Nelson received $442,705.68 in payments under his medical director contracts from these various hospices. Ex. G-68.

Many of the hospices where Nelson served as medical director were owned by either Charline Brandon or Annette Lofton. Lofton testified that in Nelson's role as medical director, he would evaluate and assess patients and see if they qualified for hospice care in exchange for a monthly fee from her. Her staff would transport patients from Clarksdale to Nelson's office in Cleveland to be evaluated. If a patient did not qualify or was not hospice appropriate, Nelson would not certify them but that was "very rare." Once patients were certified, she had care meetings every two weeks with the nurse, chaplain, social worker, volunteer coordinator, and

---

[5] Nelson initially objected to Kellough's qualification as an expert for this purpose. After additional questioning by the government, Kellough was qualified without objection.

administrator to discuss each patient. Nelson did not attend these meetings but the charts would be taken to his office in Cleveland for him to sign off on. According to Lofton, out of approximately eighty patients while she was operating hospices, only two died.

Lanetta Douglas testified that she worked for Lofton at Zion Hospice and would transport patients to Nelson's office. At times, she would take money to Nelson's office and give it to the receptionist. These payments were for patient copays and she always received a receipt to take back to her employer. At times, she would be in the examination room with the patients and Nelson would always explain what hospice was and would not certify every patient.

Lara Thompson testified she worked as a patient recruiter for Sandra Livingston at Sandanna Hospice and Milestone Hospice, both where Nelson served as a medical director. *See* Exs. G-8, G-9. She would go "door to door to solicit patients" for hospice and, if people were interested in the services, ask if they wanted to talk to one of the medical directors, including Nelson. On one occasion, she took a patient to Nelson's office to get a referral to hospice and was informed that the patient had "a large bill" and would not receive the referral until the bill was paid. Livingston paid the bill and then received the referral. She (Thompson) participated in "chart parties" or "charting parties"[6] and knew that Livingston had "cut and paste somebody's signature" but she wasn't sure whose. It was "very, very rare" for patients to die at Sandanna or Milestone.

During her testimony, Livingston admitted to forging another doctor's signature but never forged Nelson's signature. Nelson "gave very good patients" and Livingston could not remember him ever refusing to sign documents. When the government asked to see certain records and a patient chart did not have an admit order as required, Nelson's office "called [her] and told [her]

---

[6] According to Delgado, several hospices engaged in fraudulent activity, including "charting parties" where the "hospice employees would get together and work hours and hours into the night fabricating documents in preparation for a[n] … audit."

they had it" and she was able to pick it up "much later" than when the patient was seen.

Brenda Douglas worked as an outreach educator for Charline at Haven Hospice where Nelson was a medical director. Douglas testified that she transported patients to Nelson's office and would stay in the rooms with them. Nelson "would do a full workup" on the patients and tell them if they did not qualify for hospice care; but he did not tell patients who qualified that they were terminally ill and most were happy that they qualified for services. She would take cash or check payments to Nelson's office and always received a receipt. Nelson would not see patients unless they paid any balance on their account.

Kameka Bolden worked for Charline at Genesis Hospice Care as a payroll clerk.[7] She testified that she was not aware of any payments to Nelson beyond his medical director paycheck.

Sheila Craig[8] also worked for Charline's hospices as an accounts payable clerk and then later as a billing clerk. According to Craig, Haven's public relations employees were paid per patient for "convinc[ing] the patient to come on to the services."

### C. Investigation

After Delgado received allegations that hospices in the Mississippi Delta region were enrolling non-eligible patients into hospice care and learning that "a large number of the patients … discharged from hospice were discharged alive," an investigation of Nelson began. Delgado and Agent Mike Loggins[9] met with Nelson in his office on September 4, 2014, as part of an investigation of Revelation Hospice. During the meeting, Nelson confirmed to the agents that he was the medical director for Zion Hospice, Delta Soul Hospice, Divine Hospice, Mercy Hospice, Genesis Hospice Care, and Word of Deliverance Hospice. Delgado explained that they "had

---

[7] Bolden embezzled money from Charline while employed by her.

[8] Craig embezzled money from Charline while employed by her.

[9] Loggins testified that Nelson was the second highest referring doctor to what he termed "fraudulent hospices."

received information and had gathered some information that [Nelson] was enrolling non-eligible people into the hospice services of the ones he worked for."  Nelson denied the allegations and expressed concern that a former employee had forged his signature.[10]  According to Loggins, during the meeting Nelson informed them that "the ownership of Delta Soul required that he flip-flop his signature on … certificates of terminal illness … between an attending [physician] and medical director."  Loggins also testified that Nelson admitted to "robo-signing"—signing whatever records were put in front of him.[11]

The day after the meeting, Nelson called Loggins as "a follow up to getting the records [the agents] had requested" and told Loggins, "no more robo-signing."  Also after the meeting, Nelson met with several of the hospices.  Notes from these meetings indicate that Nelson informed the hospices that "robo-signing may no longer occur, and he must see patient[s] in [the] office for recertification."  *See* Ex. G-32.

As part of the investigation, Delgado and Loggins subpoenaed various medical records from Nelson and also obtained medical records from some of the hospices.

### D.  Nelson's Medical Practice

Some of Nelson's former employees testified regarding his medical practice, including Mary Baldwin.  Baldwin, who was called by the government, worked for Nelson at the front desk of his clinic from 2012 to 2015.  While employed by Nelson, hospice patients would come to the clinic, sometimes with hospice workers, and hospice workers would "come by periodically and bring a folder for [Nelson] to sign."

Nelson called as a witness Erica Johnson, who worked for him for approximately nine

---

[10] Of forty-six pages presented to Nelson for his review at the meeting, he only identified three which he believed contained forgeries.

[11] Delgado defined "robo-signing" as signing a document or numerous documents without reading them.

years.  During her employment, Nelson had a policy of requiring all copays to be paid the day of service by all patients, including hospice patients, and if a patient had an account balance, that patient was required to pay part of it before being seen by Nelson.[12]  There would be times where the hospice would pay the copay but this did not occur often.  Johnson also testified that she assisted in gathering files from Nelson's office in response to the subpoena and discovered there were multiple requests for which they did not have patient files.  Because every patient who was seen in the office had a file, the lack of a file meant they had not been seen in the office.[13]

Nelson also called Troy Armstrong as a witness.  Armstrong worked for Nelson from approximately August 2014 until September 2015.  After the agents visited Nelson in 2014, Armstrong assisted Nelson in coming up with an acknowledgement form for patients who were evaluated for hospice.

### E.  Patients

The government introduced into evidence the medical records of the relevant patients who were all placed on hospice at some point— M.A. (Mazie Anderson), E.T. (Earnestine Tillman), E.M. (Eddie Mitchell), L.E. (Linda Shields), E.C. (Eddie Clark), E.B. (Eva Bellmon), T.D. (Turome Davis), M.B. (Marjorie Brown), J.B. (Jimmy Brown), D.J. (Dorothy Johnson), E.S. (Everleen Stewart), and B.F. (Betty Fox).  Many of these patients and some of their medical professionals testified at trial as detailed below.[14]  Through the testimony of Christopher Carlton Ingram—the CEO of Performax, an entity which provides billing services for Nelson's clinic—

---

[12] Consistent with this testimony, Performax CEO Christopher Carlton Ingram testified that co-pays are a requirement of Medicaid; doctors are required to make attempts to collect co-pays; and if a doctor routinely waives the Medicaid deductible, he can be kicked out of the network, asked to repay money, and possibly face jail time.

[13] Gore, who Nelson paid to review files subpoenaed by the government before trial, confirmed at trial that Nelson did not have a file in his office for many of the patients listed on the subpoena.

[14] Testimony specific to the health of Marjorie Brown, Eddie Clark, Dorothy Johnson, and Everleen Stewart is not included in this opinion because Nelson was acquitted on the substantive counts linked to those patients.

the government also admitted account statements reflecting various charges from Nelson's clinic regarding Mitchell, Stewart, Tillman, Bellmon, Turome,[15] Marjorie,[16] Johnson, and Lofton.

Through handwriting expert Grant Sperry, Nelson challenged the legitimacy of his signature on certain documents in the various medical files, specifically regarding the likelihood that he signed the documents. Nelson also challenged the impact of the documents through Gore's testimony that she reviewed 669 patient files following the government's subpoena and determined that (1) Nelson only signed documents for patients at Charline's hospices as an attending physician, not as a certifying physician; and (2) each file included an appropriate, hospice-related diagnosis. For "pretty much" all the files connected to patients at Charline's hospices, Nelson relied on the recommendation of nurse practitioner Gwendolyn Williams.

### 1. M.A. (Mazie Anderson)

Nurses, including Williams, started coming to Mazie Anderson's house bringing her medication until she told them she did not need their services because she had a doctor. Anderson was not aware of a time she was put on hospice and never felt like she should have been on hospice. Anderson never traveled to Cleveland to visit Nelson or any other doctor.

Anderson's medical records, however, contain multiple documents signed by Nelson. *See* Ex. G-18. An August 8, 2012, IDT Initial Plan of Care & Certification Statement includes a "Certification Statement" indicating "[t]he medical prognosis of 6 months or less, if the terminal illness runs its normal course, has been confirmed by Dr. Scott Nelson on this date: August 8, 2012 by Charline Brandon," and is signed by Nelson as the attending physician. A Hospice Certification of Terminal Illness also indicates Nelson confirmed the prognosis. *See* Ex. G-18. Sperry reviewed

---

[15] Turome is referenced by his first name because a testifying witness has the same surname.

[16] To avoid confusion, Marjorie Brown and Jimmy Brown are referenced by their first names.

documents in Anderson's file to determine whether the signatures were Nelson's—his report indicates that "[n]o determination could be reached one way or the other." *See* Ex. D-36.

### 2. E.T. (Earnestine Tillman)

Earnestine Tillman lost the use of her right hand in 1999 when she had a brain tumor removed and suffered a stroke. As a result, she had to stop working but was still able to take care of herself except for needing assistance combing her hair. She was never terminally ill. She visited Nelson's office on one occasion because she thought she was being signed up for home health services.

Tillman's medical records include an August 14, 2012, "IDT Initial Plan of Care & Certification Statement" which bears Nelson's signature as her attending physician and indicates Nelson confirmed the medical prognosis of "6 months or less." Ex. G-23. Sperry's report reflects that "[t]here are indications Scott Nelson wrote [this] signature." Ex. D-36. A separate Hospice Certification of Terminal Illness is also signed by Nelson as the primary physician. Ex. G-23.

### 3. E.M. (Eddie Mitchell)

Eddie Mitchell lives alone, cooks for himself, and gets dressed without assistance. His regular doctor was Dr. Karim but he saw Nelson a couple times. Nurses picked him up and took him to see Nelson for his asthma but Nelson never told him anything about his health, that he needed to be on hospice, or that he was terminally ill or dying.

But Mitchell's medical records include documents signed by Nelson as his attending physician, including a December 5, 2014, IDT Initial Plan of Care & Certification Statement referring him for hospice care. Ex. G-25. Sperry's report indicates "Scott Nelson probably wrote [this] signature." Ex. D-36.

### 4. L.S. (Linda Shields)

Linda Shields has been on disability for several years due to diabetes, congestive heart failure, and "some … other ailments." She nonetheless is able to care for herself and her elderly parents. Nurses came to her house to sign her up for home healthcare but she was never told she was terminally ill or should be on hospice. She was never treated by Nelson.

Shields' medical records, however, include a July 24, 2012, IDT Initial Plan of Care & Certification Statement signed by Nelson as the attending physician. Ex. G-16. Sperry's report indicates that Nelson "probably wrote the questioned signature." Ex. D-36. A separate Hospice Certification of Terminal Illness is also signed by Nelson. Ex. G-16.

Dr. Jacqueline Hampton was qualified as a government expert as to Shields without objection. Hampton treated Shields in 2014 and 2015 after Shields was hospitalized for pneumonia. When Shields visited Hampton's office, "she walked into the office as an ambulatory patient and without any … supportive equipment." There was no indication Shields should have been on hospice at that time.

### 5. E.B. (Eva Bellmon)

Eva Bellmon never thought she should be on hospice, no doctor ever told her she needed to be on hospice, and she was never told she was terminally ill. She was signed up for hospice thinking that it was only for home health care. She did travel to Cleveland to visit a doctor but she was not sure if it was Nelson.

Bellmon's medical records include an IDT Initial Plan of Care & Certification Statement bearing Nelson's signature as the attending physician and stating that "[t]he medical prognosis of 6 months or less, if the terminal illness runs its normal course, has been confirmed by Dr. Scott Nelson on this date: 9/12/12." Ex. G-14. "No determination could be reached" by Sperry as to

whether this was Nelson's signature or a forgery.  *See* Ex. D-36.  Bellmon's medical file also includes a separate Hospice Certification of Terminal Illness signed by Nelson.  Ex. G-14.

### 6.  T.D. (Turome Davis)

Catherine Davis, as Turome Davis' caretaker since 2002, takes care of Turome's money for him, drives him to doctor's appointments, and picks up his medications.  But overall, "Turome takes care of Turome."  Catherine began receiving bills from Nelson indicating that Turome was on hospice.  Nelson was not Turome's doctor, Turome had never been to Nelson's office, and Turome does not have Alzheimer's.

But Turome's medical records include a December 27, 2012, IDT Initial Plan of Care & Certification Statement listing a diagnosis of Alzheimer's, among other conditions, and a certification statement "confirmed by Dr. Scott Nelson" and bearing Nelson's signature.  Ex. G-19.  According to Sperry's report, "there [were] indications Scott Nelson did not write [this] signature."  Ex. D-36.

### 7.  J.B. (Jimmy Brown)

Jimmy Brown has laid bricks for the past forty years.  No one ever told him he was terminally ill and he never received hospice services but nurses and social workers came to his house for his wife, Marjorie.[17]  Jimmy never visited Nelson's office in Cleveland.

But Jimmy's medical records include a March 8, 2013, IDT Initial Plan of Care & Certification Statement bearing Nelson's signature as the attending physician and stating that Nelson confirmed the medical prognosis of six months or less.  Ex. G-15.  Based on Sperry's report, "'[t]here are indications Scott Nelson wrote [this] signature."  Ex. D-36.  A separate

---

[17] When the government asked Marjorie if there was ever a time she thought Jimmy should be on hospice, she responded that he was not home long enough because he still worked.

Hospice Certification of Terminal Illness is also signed by Nelson.  Ex. G-15.

### 8.  B.F. (Betty Fox)

Dr. Amita Patel, who testified as an expert regarding Betty Fox, saw Fox "quite a bit" as her primary care physician from 2008 until Fox died.  Although Patel recalled that Fox had high blood pressure, a history of a "GI bleed," and possible thyroid problems, she did not have a terminal diagnosis.  Patel did not certify Fox for hospice and only became aware that she was on hospice when a claim for care Patel provided was denied.

Fox's medical records include a February 23, 2012, IDT Initial Plan of Care & Certification Statement signed by Nelson as the attending physician.  Ex. G-20.  Sperry's report reflects that "[t]here are indications Scott Nelson wrote [this] signature."  Ex. D-36.  A separate May 23, 2012 Hospice Certification of Terminal Illness also includes Nelson's signature.  Ex. G-20.

### IV
### Motion for Acquittal

Nelson argues that the "verdict was irrational, inconsistent, and contrary to the evidence" because, according to him, there was no evidence to support the substantive healthcare fraud counts, his "convictions cannot be reconciled with the counts in which he was acquitted," and the government "fail[ed] to introduce evidence that [he] entered into a conspiracy with … anyone else to defraud Medicare."  Doc. #320 at 2–22.

### A.  Healthcare Fraud

With respect to each healthcare fraud count on which he was convicted, Nelson argues (1) there was no evidence he was the certifying physician and (2) even if he did certify the patients, there was no evidence he did so knowing they were not terminally ill.  *Id.* at 2–13.

### 1.  Certification

Nelson contends that the verdict assumes his signature appears on documents "[d]espite

the unrebutted testimony from handwriting expert Grant Sperry concerning the potential forgery of each signature in each patient chart" and also that the verdict incorrectly assumes he "was the certifying physician, despite evidence to the contrary." Doc. #320 at 4. The government responds that "[e]very medical file admitted as evidence … contains a physician's order signed by Nelson, an IDT Initial Certification and Plan of Care signed by Nelson, and a Certification of Terminal Illness signed by Nelson;" while Sperry "did call into question some of the signatures in the medical records, his report also confirmed many of Nelson's signatures;" and "[t]he jury was free to accept or reject [Sperry's] testimony." Doc. #322 at 15–16 (emphasis omitted).

As to whether Nelson was the certifying physician, the government introduced medical records for the patients specified in the substantive counts. The medical records of each patient associated with the guilty verdict on a healthcare fraud count contain at least one document titled "IDT Initial Plan of Care & Certification Statement" bearing what appears to be Nelson's signature as the attending physician under a "Certification Statement" heading. *See* Exs. G-18 (Mazie Anderson); G-23 (Earnestine Tillman); G-25 (Eddie Mitchell); G-16 (Linda Shields); G-14 (Eva Bellmon); G-19 (Turome Davis); G-15 (Jimmy Brown). Some of those records also contain a separate "Hospice Certification of Terminal Illness." *See* Ex. G-18, G-23, G-16, G-14, G-15, G-20. And despite Nelson's argument that only the physician who drafted the written narrative is the certifying physician, the relevant regulation—which was introduced into evidence at trial—specficially provides that the intial written certification must be signed by the medical director *and* the attending physician. 42 C.F.R. § 418.22(c). Additionally, testimony at trial detailed the requirement of two physicians' signatures on the initial certification. There was thus sufficient evidence to support a finding by the jury that Nelson was one of two certifying physicians for each relevant patient.

Although Nelson relies on Sperry's expert "testimony concerning the various likelihood of forgeries as to each patient," Sperry's report indicates that for six of the seven patients linked to convictions, there were either "indications Scott Nelson wrote the questioned signature," "Nelson probably wrote the questioned signature," or "[n]o determination could be reached one way or the other." *See* Ex. D-36. Only with respect to Turome does Sperry's report reflect there were indications Nelson did not write the signature on the IDT Initial Plan of Care & Certification Statement. *See id.* But on its cross-examination of Sperry, the government clarified with Sperry that there were "only indications" and "nothing highly probable" demonstrating it was *not* Nelson's signature on documents in Turome's chart. And consistent with the government's argument that the "jury was free to accept or reject the expert's testimony," Doc. #322 at 15, the Court instructed the jury:

> Merely because [an expert] witness has expressed an opinion does not mean, however, that you must accept this opinion. You should judge such testimony like any other testimony. You may accept it or reject it and give it as much weight as you think it deserves, considering the witness's education and experience, the soundness of the reasons given for the opinion and all other evidence in the case.

Doc. #305 at PageID 1322. So the jury was not required to accept Sperry's testimony regarding Nelson's signature in Turome's medical file. In short, there was sufficient evidence for the jury to conclude Nelson certified each of the relevant patients for hospice.

## 2. Knowledge

Nelson argues that "even assuming [he] was the certifying physician, there is no evidence that he certified each patient knowing that the patient was not terminally ill" because (1) "Medicare regulations allow [him] to rely on a nurse's medical documentation for certification" and (2) the fact that a patient lived "past the initial prognosis" is insufficient because he "properly diagnose[d] the patient and certif[ied] them as terminally ill." Doc. #321 at 6. The government responds that

"the evidence showed that Nelson actively participated in a blatant fraud against Medicare, referring and certifying patients for hospice that he saw in person in his office that clearly were not terminally ill and should not have been referred to hospice." Doc. #322 at 18.

Despite Nelson's reliance on Medicare regulations,[18] the relevant question is whether Nelson "knowingly and willfully execute[d], or attempt[ed] to execute, a scheme or artifice … to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money … owned by … any health care benefit program." 18 U.S.C. § 1347(a). As the Court instructed the jury—without objection by Nelson—"a representation is false if it is known to be untrue or is made with reckless indifference as to its truth or falsity" and "while knowledge on the part of the defendant cannot be established merely by demonstrating that the defendant was negligent, careless, or foolish, knowledge can be inferred if the defendant deliberately blinded himself to the existence of a fact." Doc. #305 at PageID 1327, 1332. Thus, with respect to each count of conviction, the relevant question is whether there was sufficient evidence to show that, at the time Nelson certified each patient, he (1) knew the patient was not hospice appropriate; (2) acted with reckless indifference as to whether the patient was hospice appropriate; or (3) blinded himself to whether the patient was hospice appropriate.

*a. Count Two – M.A. (Mazie Anderson)*

Regarding Anderson, Nelson argues that "Dr. James Warrington drafted the narrative for the certification and signed as the certifying doctor, while Dr. Nelson's [sic] signed as the treating or attending physician" after "Williams conducted the initial health and physical examination," and the government "called neither Dr. Warrington nor Ms. Williams." Doc. #321 at 6–7. The

---

[18] The regulations seem to contradict Nelson's argument that he could rely on his nurse practitioner alone because the regulations specifically provide that "[c]ertification will be based on the *physician's or medical director's* clinical judgment regarding the normal course of the individual's illness." 42 C.F.R. § 418.22(b) (emphasis added).

government responds that Nelson "signed a Physician's Order referring Ms. Anderson to hospice dated August 8, 2012, as well as a Certificate of Terminal Illness and an IDT Plan of Care and Initial Certification dated August 8, 2012;" Anderson did not see Nelson at his office; Anderson testified at trial and "[i]t was obvious to the jury, with or without medical training, that [she] was not remotely hospice appropriate;" and her "hospice admission is an example of Nelson's willingness to robo-sign documents with compete disregard for the actual condition of the underlying patient." Doc. #320 at 18.

The evidence at trial showed that Nelson engaged in signing documents without reviewing them, that he had a contractual relationship with the hospices in question, and that although Anderson never visited Nelson's office, her medical records contained multiple documents certifying her for hospice based on Nelson's signature. Under these circumstances, there was sufficient evidence for the jury to conclude that Nelson had knowledge Anderson was not terminally ill or that he "deliberately blinded himself" to that fact.

### b. Count Three – E.T. (Earnestine Tillman)

Nelson argues his "purported signature was on the first certification of terminal illness as [Tillman's] treating physician, [but] Sperry indisputably testified that the purported signature was likely a forgery," and though "Tillman testified that [she] did not feel as though she was dying, her medical records showed that she had a brain tumor and history of strokes." Doc. #321 at 7. The government responds that the evidence supported the jury's verdict because Nelson saw "Tillman in person just a few days before referring her to hospice and certifying her as terminally ill for coma-like symptoms" when she "clearly was not terminally ill and certainly was not comatose, as shown by her in-person testimony at trial." Doc. #322 at 19.

Nelson is correct that Sperry testified there were indications he did not sign certain

documents in Tillman's file. But with respect to the IDT Initial Plan of Care & Certification Statement, Sperry's report states that "[t]here are indications Scott Nelson *wrote* the questioned signature." *See* Ex. D-36 (emphasis added). Tillman testified she visited Nelson's office on one occasion to be signed up for home health care but she was able to take care of herself at all times. Thus, based on Tillman's testimony regarding her health and single visit to Nelson's office, the testimony related to robo-signing, and Sperry's opinion that signatures in Tillman's file were Nelson's, there was sufficient evidence to support the conclusion that Nelson certified Tillman for hospice knowing she was not hospice appropriate.

### c. Count Four – E.M. (Eddie Mitchell)

Nelson argues Eddie Mitchell's "medical records showed that [Mitchell] visited [him] two months *after* Dr. Karim certified him for hospice and he was already under the care of Haven Hospice," and "there is no testimony proving that [he] falsely certified Mr. Mitchell—which would have also meant that he *and* Dr. Karim improperly certified Mr. Mitchell." Doc. #321 at 7–8. The government responds that Karim signed the March 14, 2014 IDT Initial Plan of Care & Certification Statement "exactly the same way Nelson signed documents for every other patient listed in the Indictment" and "Nelson cannot claim on the one hand, that he did not certify any of the patients for hospice because he only signed … as the attending physician and then claim on the other hand that Dr. Karim certified … Mitchell because he signed a Physician's Order and a certification as his attending physician." Doc. #322 at 21–22.

Based on Mitchell's testimony that he lives alone and cares for himself, was never terminally ill or dying, and visited Nelson for asthma treatment; the medical records showing Nelson's signature on documents approving Mitchell for hospice; and the trial testimony that two physicians' signatures were required to certify a patient for hospice, there was sufficient evidence

for the jury to conclude Nelson knew Mitchell was not terminally ill at the time he certified him for hospice.

### d. Count Five – L.S. (Linda Shields)

With respect to Linda Shields, Nelson recognizes that Shields "testified that she never met [him];" "[his] signature was affixed as the attending physician" to certificates of terminal illness in her file; and "Sperry testified that the signature was more than likely [his] signature." Doc. #321 at 8. Despite acknowledging this evidence, Nelson seems to argue that because Shields "testified that she received disability benefits for the past thirteen years," has a history of heart failure and diabetes, and her primary care physician, Dr. Jacqueline Hampton, "testified that there was a clear difference between diagnosis and prognosis and that it was difficult to accurately determine the life expectancy of a hospice patient," there was insufficient evidence to conclude he knew Shields was not appropriate for hospice. Doc. #321 at 8. The government responds that "Shields' hospice admission is another example of Nelson's willingness to robo-sign documents with complete disregard for the actual condition of the underlying patient." Doc. #322 at 24.

Given Shields' testimony that she is able to care for herself and was never treated by Nelson, the medical records reflecting Nelson's signature certifying Shields for hospice, Hampton's testimony that there were no indications Shields should be on hospice, and the robo-signing evidence, the trial evidence was sufficient to show Nelson knew or deliberately blinded himself to the fact that Shields was not an appropriate hospice patient.

### e. Count Seven – E.B. (Eva Bellmon)

Nelson seems to argue that Dr. James Warrington certified Eva Bellmon for hospice based on the initial health and physical evaluation of nurse Janice McNeal and because neither Warrington nor McNeal testified, there is no evidence he knew Bellmon was not hospice

appropriate. Doc. #321 at 8. The government responds that Nelson "signed a Physician's Order referring Ms. Bellmon to hospice [on] September 12, 2012 as well as a Certificate of Terminal Illness and an IDT Plan of Care and Initial Certification" but did not see her in his office until May 6, 2013, and "if [he] had been trying to make even a half-hearted attempt to actually provide care to [her], he would have spoken to her about her hospice diagnosis." Doc. #322 at 25.

Based on Bellmon's medical records including documents signed by Nelson certifying her for hospice, Bellmon's testimony that she was signed up for hospice thinking it was only for home health care and was never told she was terminally ill, and the testimony related to robo-signing, there was sufficient evidence for the jury to conclude Nelson certified Bellmon for hospice with reckless indifference as to whether she qualified for services.

### f.  Count Eight – T.D. (Turome Davis)

Nelson argues "no rational jury could have found that [he] falsely certified [Turome]" because the government "never called [him] to testify about his health or need for hospice," instead relying on the testimony of his caretaker; Turome "was put on hospice approximately six months prior to seeing [him] by Dr. Karim; and while his signature appears on two certificates of terminal illness, Sperry testified that one was "likely forged" and the second was "indeterminant." Doc. #321 at 9. The government responds that the caretaker's testimony "established that … [Turome] was not terminally ill in 2022 … and he was not terminally ill in 2012 when he was placed on hospice," and Nelson saw Turome in his office and afterwards "signed recertifications of terminal illness" "claiming … [Turome] had Alzheimer's disease, yet made no attempt to speak to his primary caregiver." Doc. #322 at 26.

As to Sperry's conclusion that "there [were] indications Scott Nelson did not write [a certain] signature" in Turome's file, as explained above, the jury was free to accept or reject

Sperry's testimony. In light of the testimony that Turome cares for himself with some assistance, never visited Nelson's office, and did not have Alzheimer's, considered with the medical records listing such a diagnosis and certifying him for hospice, there was sufficient evidence to conclude Nelson certified Turome for hospice and turned a blind eye to whether hospice care was appropriate.

### g. Count Ten – J.B. (Jimmy Brown)

Nelson argues Jimmy Brown's "medical records follow the typical pattern of a nurse conducting the initial health and physical examinations" and "[o]n both CTIs, Dr. Warrington wrote the narratives and signed as the certifying physician, while Dr Nelson's signatures were affixed as the attending physician." Doc. #321 at 9–10. The government responds that Nelson signed multiple documents, including an IDT Plan of Care and Initial Certification, referring Jimmy to hospice but never saw him in his clinic; at the time he was placed on hospice, Jimmy "was actively working as a bricklayer;" and "[i]t was very clear to anyone who saw [him] that he was not hospice appropriate in March 2022 and certainly not in March 2013." Doc. #322 at 27.

The trial evidence reflected that Jimmy worked as a brick layer at all relevant times, he never visited Nelson's office, he was never told he was terminally ill, and his medical records contain documents signed by Nelson certifying him as terminally ill and appropriate for hospice care. Combined with the evidence of robo-signing and Nelson's relationship with the subject hospice, there was sufficient evidence for the jury to conclude Nelson certified Jimmy for hospice with reckless indifference as to whether he was hospice appropriate.

### 3. Summary

As to each substantive count of healthcare fraud appealed by Nelson, there was sufficient evidence for the jury to conclude Nelson certified each patient for hospice services either knowing

such services were not appropriate and/or acting with reckless indifference to whether hospice services were appropriate. Under these circumstances, the verdict as to each such count is not against the weight of the evidence.

### B. Inconsistent Verdicts

Nelson argues that his "convictions cannot be reconciled with the counts in which he was acquitted" because "the majority of the substantive counts follow the same pattern" of a nurse evaluation followed by him signing as the attending physician, and "[d]espite the identical patterns of certifications among the various patients," he was acquitted on the counts relating to Marjorie Brown and Eddie Clark. Doc. #321 at 14–15. The government responds that "[t]he only question for the Court is whether the evidence supported the counts of conviction" and "[e]ven if the jury's verdicts were inconsistent, the defendant would not be entitled to reversal of his conviction." Doc. #322 at 28 (quoting *United States v. Reid*, 268 F.3d 1063 (5th Cir. 2001)).

Even presuming the verdicts are inconsistent, the Court agrees such inconsistency would not entitle Nelson to relief. In the Fifth Circuit, "the law is clear that inconsistent verdicts are not a bar to conviction so long as there is sufficient evidence to support the jury's determination of guilt." *United States v. Gieger*, 190 F.3d 661, 664 (5th Cir. 1999); *see United States v. Eghobor*, 812 F.3d 352, 363 n.5 (5th Cir. 2015) (courts "consider all trial evidence separately when determining the sufficiency of the evidence as to each count"); *United States v. Straach*, 987 F.2d 232, 241 (5th Cir. 1993) ("An acquittal does not necessarily equate with a finding that the defendant was innocent. The not guilty verdict may be the result of compromise, confusion, leniency, and so forth. Just as none of these factors can be raised by a juror attempting to overturn a guilty verdict, none can be used to argue that an acquittal on one count requires reversal of a guilty verdict on the other count."). Because the Court determined sufficient evidence supports

each conviction of healthcare fraud, Nelson is not entitled to relief due to any alleged inconsistency among the verdicts.

## C. Conspiracy

Nelson argues that "the Government failed to present evidence crucial for the key element of a conspiracy allegation: an agreement between co-conspirators" because "[w]hile the Government established that [he] was a medical director for fourteen hospices, [it] offered no proof that [he] … knew of the hospices' practices and schemes to act unlawfully." Doc. #321 at 16–17. According to Nelson, "[w]ithout [his] knowledge of the hospices' practices, there was insufficient evidence to conclude that he … acted with 'bad purpose' as required to support a conspiracy conviction." *Id.* at 22.

The government responds that Nelson "actually entered into written agreements with each hospice listed in the Indictment[ and e]vidence at trial demonstrated that these hospices were operated as complete frauds." Doc. #322 at 10. The government also argues Nelson "participated in the conspiracy by referring patients to hospice, certifying patients for hospice, robo-signing documents, and all of the above." *Id.* at 11. Using Tillman as an example, the government submits that "Medicare paid Charline Brandon, through Haven Hospice, $23,725.03 for [her] from August 14, 2012 to February 9, 2013[;] Nelson's own billing records show that he saw … Tillman for a new patient visit on August 10, 2012" and signed a prescription order for hospice the same day; Nelson signed additional documents referring Tillman to hospice and indicating a medical prognosis of six months or less to live; and Tillman testified that Nelson never discussed hospice with her and she was not an appropriate patient for such services. *Id.* at 13–15. Further, the government argues Nelson was paid $442,704.68 "by the hospice operations named in the Indictment" for his medical director services and Nelson also "billed Medicare Part B when

patients visited his office" such that his "medical director income [was] pure profit." *Id.* at 17.

To support a conviction for conspiracy to commit healthcare fraud, "the Government must prove beyond a reasonable doubt that: (1) two or more persons made an agreement to commit health care fraud; (2) that the defendant knew the unlawful purpose of the agreement; and (3) that the defendant joined the agreement with the intent to further the unlawful purpose." *United States v. Ganji*, 880 F.3d 760, 767 (5th Cir. 2018) (cleaned up). While "[a]greements need not be spoken or formal," "[m]ere similarity of conduct among various persons and the fact that they have associated with or are related to each other is insufficient to prove an agreement." *Id.* at 767–68.

Both at trial and in his post-trial motion, Nelson relies heavily on *Ganji*—which dealt with healthcare fraud in relation to home health care—to support his argument there was insufficient evidence to support his conviction. Similar to Nelson, Dr. Ganji served as a medical director for a home health care service in exchange for a $1,000 monthly payment and, in that capacity, certified patients for home health care. *Ganji*, 880 F.3d at 764. At Ganji's trial, the government presented evidence that two nurses would refer patients for services and "tak[e] the certification form to Dr. Murray for certification. Without extensive review of the patient's record or thorough inquiry into their homebound status, Dr. Murray signed the documents." *Id.* at 766. Ganji testified that after she replaced Murray, a nurse practitioner would perform an initial assessment on the patient and evaluate what kind of services were needed and bring that information to her; she would "also obtain records of that patient from different hospitals if they were ever admitted," as well as "paperwork from the home health agency;" and after reviewing and comparing all the records, she would "come up with the treatment plan." *Id.* at 771 n.8. The Fifth Circuit overturned Ganji's conviction for conspiracy to commit healthcare fraud because "[t]he evidence proved that (1) Dr. Murray, who previously held a similar position, defrauded Medicare, and when Dr. Ganji

accepted the job, she (2) received a monthly check for $1,000 and (3) began referring more patients [for home health care] than before" but "[t]hese actions, whether viewed individually or in concert, [were] insufficient to prove that Dr. Ganji agreed with anyone to defraud Medicare." *Id.* at 771.

Although Nelson attempts to compare himself to Ganji, the trial evidence shows Nelson's actions were more similar to Murray's. Unlike Ganji—who testified she came up with treatment plans after a detailed review of the nurse practitioner's assessment and other medical records— Nelson, based on the trial evidence, signed documents brought to him by individuals associated with the various hospices without any review of what the documents were, let alone whether their contents were corroborated by other sources. Additionally, Lofton testified she paid Nelson a monthly fee as Zion Hospice's medical director and the government submitted documentary evidence reflecting both Nelson's contractual relationship with several hospices and his income as a result of those relationships. Lofton also testified her staff would transport patients to Nelson's office to be evaluated; it was "very rare" that Nelson would not certify a patient; and once the patients were certified, Nelson did not attend care meetings but would sign off on charts taken to his office. Furthermore, Thompson testified Nelson refused to see a patient for a hospice referral until a large bill was paid; Livingston could not remember a time when Nelson refused to sign hospice documents; Lanetta testified Zion Hospice would pay patient copays to Nelson; and Loggins testified regarding Nelson's admission that one hospice required him to switch between signing as a medical director and an attending physician. And as discussed above, there was evidence Nelson certified patients he knew were not appropriate for hospice. Viewing all the evidence in the light most favorable to the government, there was sufficient evidence "of the conspirators' individual actions, that taken together, evidence an agreement to commit an unlawful objective beyond a reasonable doubt." *Ganji*, 880 F.3d at 768–69. Accordingly, Nelson is not

entitled to relief on the conspiracy conviction.

## V
## Request for New Trial

In both his initial motion and in his addendum, Nelson requests a new trial. The arguments in each instance do not justify such relief.

### A. New Trial Request in Motion

In support of his motion for a new trial, Nelson argues that Loggins "effectively admitted to perjury, inflating the amounts paid to [him] as medical director by approximately $105,000.00, and that the false information was material—the Government's case, both the grand jury and trial jury, centered largely around [his] payments as medical director." Doc. #321 at 25. According to Nelson, the "perjured statements to the grand jury warrant a dismissal of this case with prejudice or an evidentiary hearing to determine the level of impunity to the Government," and statements to the trial jury "unfairly prejudiced" him. *Id.* The government responds that the indictment "contained an error describing the amounts paid by various hospice operations to Nelson;" "[t]his error was not intentional;" and "[t]here is no indication this error influenced the Grand Jury's decision to indict."[19] Doc. #322 at 29. With respect to the trial, the government argues it "did not grossly exaggerate Nelson's medical director stipends" because all of the amounts listed in its exhibits were provided by Nelson himself and linked to hospices named in the Indictment. *Id.* at 30–31.

> As a general matter, a district court may not dismiss an indictment for errors in grand jury proceedings unless such errors prejudiced the defendant. Dismissal of the indictment is appropriate only if it is established that the violation substantially influenced the grand jury's decision to indict, or if there is grave doubt that the decision to indict was free from the substantial influence of such violations. Put another way, whether or not prosecutorial misconduct prejudiced a defendant

---

[19] The government submits that the total of the figures listed in the indictment "is actually less than the total amount proven … at trial." Doc. #322 at 30.

depends on whether it affected the grand jury's decision to indict.

…

…[E]ven perjured grand jury testimony does not demand dismissal of the indictment under the district court's supervisory power unless the perjury was knowingly sponsored by the government. Accordingly, when a defendant claims that the prosecution put false information before the grand jury, [a court] ask[s] two questions: (1) did the government knowingly sponsor false information before the grand jury and (2) was that information material, that is, was the information capable of influencing the grand jury's decision.

*United States v. Cessa*, 861 F.3d 121, 141–42 (5th Cir. 2017) (cleaned up).

The Court is not convinced that Loggins committed perjury. Perjury involves "deliberately making material false or misleading statements while under oath; esp., the willful utterance of untruthful testimony under oath or affirmation, before a competent tribunal, on a point material to the adjudication." *Perjury*, Black's Law Dictionary (11th ed. 2019); *see* 18 U.S.C. § 1621 (a person is guilty of perjury when, under oath to testify truthfully, he "willfully and contrary to such oath states or subscribes any material matter which he does not believe to be true"). At trial, Loggins testified the amounts he provided to the grand jury "that ended up in the indictment" were based on information the prosecutor's office auditor collected from numerous bank accounts of the hospices and Nelson whereas the amounts presented at trial were based on Nelson's own profit and loss statement, which resulted in higher amounts being presented at trial. On cross examination, Nelson's counsel questioned Loggins regarding his grand jury testimony— specifically, his affirmative response when he was asked whether he had "checked" all the figures in the indictment—and Loggins explained he relied on the auditor and did not review the bank records to confirm her work but rather had compared the information from the auditor to the information in the indictment. Based on Loggins' explanation that he checked the numbers in the indictment against the auditor's calculations, there is no indication he willfully provided an untrue statement.

Even if Loggins did know his statement was untrue, there is nothing in the record to indicate that the *amount* of the payments—as opposed to the fact that the payments occurred— was material to the grand jury's decision to indict. Even Nelson argues that "the Government's case … centered largely around [his] *payments* as medical director," without any reference to the *amount* of those payments. Doc. #321 at 25. Accordingly, Nelson has not shown he was prejudiced by any errors in the grand jury proceedings.

With respect to Nelson's argument that the Court improperly allowed the inclusion of amounts paid to Nelson "for *all* hospices in which he was the medical director from 2009 to 2014— several of which had no substantive allegations associated with them," the argument is not supported by the facts. All the hospices listed on the summary of Nelson's hospice revenue are specifically listed in the indictment as being linked to the conspiracy. *Compare* Ex. G-68 *with* Doc. #1 at ¶¶ 20, 26. So there is no indication Nelson was prejudiced by the inclusion of evidence related to those hospices. Accordingly, he is not entitled to relief based on the inclusion of such evidence.

### B. New Trial Request in Addendum

In the "Addendum" to his post-trial motion, Nelson submits that after his conviction, CMS "issued its revocation letter to [him], advising that his Medicare privileges were being revoked;" he appealed the decision after filing his motion for judgment of acquittal; and "[b]y letter dated May 31, the CMS Center for Program Integrity confirmed CMS's rescission of its initial determination, restoration of [his] Medicare enrollment, and advis[ed] that [he] would not be added to the CMS Preclusion List." Doc. #332 at 1–2. Nelson argues that "CMS's ultimate determination … that [he] committed no regulatory violation to warrant a revocation of his Medicare privileges is newly discovered evidence, warranting a new trial in the interests of justice"

and that the letter "satisfies each requirement of the *Berry* test." *Id.* at 2, 3.

The government responds that CMS reserved the right "to conduct further inquiry and to take any action that [it] may determine to be appropriate," including "potential future action that pertains to the particular underlying conduct that served as the basis of the now rescinded revocation," so the recission is not "the equivalent of an exoneration of [Nelson's] underlying criminal conduct." Doc. #334 at 2. In support of its response, the government submitted an e-mail communication from the Center for Program Integrity to Loggins stating that Nelson's "revocation was rescinded as [CMS] had discovered that [Nelson] has not yet been convicted of the felony per [its] definition of 'convicted' under 42 C.F.R. § 1001.2" since there has not yet been "acceptance/adoption of the jury verdict by the court to show a finding of guilt." Doc. # 334-1. The e-mail also states that "once there is a finding of guilt by the court that meets the regulatory definition of 'convicted,' [CMS] would be proceeding with revocation." *Id.*

Nelson presumably categorizes CMS' decision as "new evidence" because his Addendum is otherwise untimely. *See* Fed. R. Crim. P. 33(b) (motions "grounded on any reason other than newly discovered evidence must be filed within 14 days after the verdict or finding of guilty" but motions "grounded on newly discovered evidence must be filed within 3 years after the verdict or finding of guilty"). Motions based on new evidence are "disfavored and reviewed with great caution." *United States v. Dickerson*, 909 F.3d 118, 125 (5th Cir. 2018). To succeed, such a motion

> must meet the *Berry* rule conditions: first, the evidence must be newly discovered, unknown to the defendant at the time of trial; second, the failure to detect the evidence must not have been due to a lack of diligence; third, the evidence cannot be merely cumulative or impeaching; fourth, the evidence must be material; and fifth, if the evidence were introduced at a new trial, the probable result must be an acquittal.

*Id.* "Failure to demonstrate any one of these five factors is fatal to the motion for a new trial."

*United States v. Chapman*, 851 F.3d 363, 381 (5th Cir. 2017).

The Court concludes that the CMS letter does not satisfy the last two *Berry* conditions. Contrary to Nelson's argument, nothing in the letter indicates that CMS' recission of the revocation was based on a review of the facts leading to his conviction, as opposed to the fact that the conviction occurred. *See* Doc. #332-2. Even if the letter did indicate CMS determined that Nelson had not violated any relevant *regulations*, as the Court has repeatedly explained, the question is whether the trial evidence sufficiently supported the conclusion that Nelson violated the relevant criminal *statute*. And the Court already detailed above the ways in which the evidence at trial was indeed sufficient to support the convictions under the relevant statutes. Thus, the Court does not agree that CMS' letter is material evidence or that it would likely result in an acquittal in light of all the evidence presented at trial. Because Nelson has not satisfied all of the *Berry* conditions, a new trial is not warranted.

## VI
## Conclusion

Nelson's "Motion for Judgment of Acquittal and/or New Trial" [320] and "Addendum to Defendant's Motion for Judgment of Acquittal and/or New Trial" [332] are **DENIED**.

**SO ORDERED**, this 8th day of February, 2023.

/s/Debra M. Brown
**UNITED STATES DISTRICT JUDGE**